# Exhibit A

APPROVED: _____ ─x/11/10        **09 MAG  2719**
JEFFREY A. BROWN / CHRISTIAN R. EVERDELL
Assistant United States Attorneys

BEFORE:    THE HONORABLE KEVIN N. FOX
           United States Magistrate Judge
           Southern District of New York

- - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA              :

           - v -   Julin Gatto (fed Def.)  :    **SEALED COMPLAINT**
                        - Wnitz
OUMAR ISSA,                            :    Violations of
HAROUNA TOURÉ, and                          21 U.S.C. § 960a,
IDRISS ABELRAHMAN,                     :    18 U.S.C. §§ 2339B
                                            & 3238.
                Defendants.            :

- - - - - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

        DARIA LUPACCHINO, being duly sworn, deposes and says
that she is a Special Agent of the Drug Enforcement
Administration ("DEA"), and charges as follows:

### COUNT ONE: NARCO-TERRORISM CONSPIRACY

        1.    From at least in or about September 2009, up to
and including the present, in an offense occurring in and
affecting interstate and foreign commerce, begun and committed
outside of the jurisdiction of any particular State or district
of the United States, OUMAR ISSA, HAROUNA TOURÉ, and IDRISS
ABELRAHMAN, the defendants, at least one of whom will be first
brought to and arrested in the Southern District of New York, and
others known and unknown, unlawfully, intentionally and knowingly
did combine, conspire, confederate and agree together and with
each other to violate the laws of the United States.

        2.    It was a part and an object of said conspiracy that
OUMAR ISSA, HAROUNA TOURÉ, and IDRISS ABELRAHMAN, the defendants,
and others known and unknown, would and did engage in conduct
that would be punishable under Title 21, United States Code,
Section 841(a) if committed within the jurisdiction of the United
States, to wit, the distribution, and possession with the intent
to distribute, of five kilograms and more of mixtures and
substances containing a detectable amount of cocaine, knowing and
intending to provide, directly and indirectly, something of
pecuniary value to a person and organization that has engaged and
engages in terrorist activity and terrorism, to wit, the Fuerzas
Armadas Revolucionarias de Colombia ("FARC"), which was

designated by the United States Secretary of State as a foreign
terrorist organization in October 1997, pursuant to Section 219
of the Immigration and Nationality Act, and was re-designated as
such on October 2, 2003, and October 11, 2005, and is currently
designated as such as of the date of the filing of this
Complaint, and its members, operatives and associates, in
violation of Section 960a of Title 21, United States Code.

       3.   It was further a part and an object of said
conspiracy that OUMAR ISSA, HAROUNA TOURÉ, and IDRISS ABELRAHMAN,
the defendants, and others known and unknown, would and did
engage in conduct that would be punishable under Title 21, United
States Code, Section 841(a) if committed within the jurisdiction
of the United States, to wit, the distribution, and possession
with the intent to distribute, of five kilograms and more of
mixtures and substances containing a detectable amount of
cocaine, knowing and intending to provide, directly and
indirectly, something of pecuniary value to a person and
organization that has engaged and engages in terrorist activity
and terrorism, to wit, (a) Al Qaeda, which was designated by the
United States Secretary of State as a foreign terrorist
organization on October 8, 1999, pursuant to Section 219 of the
Immigration and Nationality Act, and was re-designated as such on
October 5, 2001, October 2, 2003, and April 28, 2006, and is
currently designated as such as of the date of the filing of this
Complaint, and its members, operatives and associates, in
violation of Section 960a of Title 21, United States Code; and
(b) Al Qaeda in the Islamic Maghreb (or "AQIM"), which was
designated by the United States Secretary of State as a foreign
terrorist organization in February 2008, pursuant to Section 219
of the Immigration and Nationality Act, and is currently
designated as such as of the date of the filing of this
Complaint, and its members, operatives and associates, in
violation of Section 960a of Title 21, United States Code.

(Title 21, United States Code, Section 960a, and Title 18, United
               States Code, Section 3238.)

20-11k

### COUNT TWO: CONSPIRACY TO PROVIDE
### MATERIAL SUPPORT TO A FOREIGN TERRORIST ORGANIZATION

       4.   From at least in or about September 2009, up to
and including the present, in an offense occurring in and
affecting interstate and foreign commerce, begun and committed
outside of the jurisdiction of any particular State or district
of the United States, OUMAR ISSA, HAROUNA TOURÉ, and IDRISS
ABELRAHMAN, the defendants, at least one of whom will be first
brought to and arrested in the Southern District of New York, and
others known and unknown, unlawfully and knowingly did combine,
conspire, confederate and agree together and with each other to
provide "material support or resources," as that term is defined
in Title 18, United States Code, Section 2339A(b), to the FARC,

Al Qaeda, and AQIM, each of which has been designated by the United States Secretary of State as a foreign terrorist organization, as set forth above.

5.   It was a part and an object of the conspiracy that OUMAR ISSA, HAROUNA TOURÉ, and IDRISS ABELRAHMAN, the defendants, and others known and unknown, would and did agree to provide the FARC with, among other things, logistical assistance and secure transport for a shipment of cocaine across Africa, and other support and resources, knowing that the FARC had engaged and was engaging in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), and that the FARC had engaged and was engaging in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989), in violation of Title 18, United States Code, Section 2339B.

6.   It was further a part and an object of the conspiracy that OUMAR ISSA, HAROUNA TOURÉ, and IDRISS ABELRAHMAN, the defendants, would and did agree to provide support and resources (including themselves) to Al Qaeda and AQIM, knowing that Al Qaeda and AQIM had engaged and were engaging in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), and that Al Qaeda and AQIM had engaged and were engaging in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989), in violation of Title 18, United States Code, Section 2339B.

(Title 18, United States Code, Sections 2339B(a)(1), (d)(1)(C), (d)(1)(E) and 3238.)

The bases for my knowledge and the foregoing charges are as follows:

7.   I am a DEA agent with 10 years' experience.  I have participated in the investigation of this matter, and have spoken with other individuals, including federal agents, other law enforcement officials, and other witnesses.  When I rely on statements made by others, such statements are related in sum and substance unless otherwise indicated.  Moreover, because this affidavit is submitted for the limited purpose of establishing probable cause supporting the arrests of the defendants, I have not set forth each and every fact learned during the course of this investigation.  Indeed, I have omitted mention of some of the facts known about the defendants in order to protect sensitive sources of information.

3

## Fuerzas Armadas Revolucionarias de Colombia (the FARC)

8.    During the course of my investigation, I have
become familiar with the Fuerzas Armadas Revolucionarias de
Colombia (the "FARC") through a variety of sources, including,
but not limited to, DEA investigations of the FARC, and persons
who have been associated with the FARC.  From these sources, I
have learned that the FARC is an international terrorist
organization.  Specifically, I have learned the following:

a.    From in or about 1964 until on or about the
date of filing of this Complaint, the FARC has been and is an
international terrorist group dedicated to the violent overthrow
of the democratically elected Government of Colombia.

b.    The FARC is a highly structured terrorist
organization, styled as a military group and comprised of
approximately 12,000 to 18,000 armed guerillas organized into
seven "blocs," 68 numbered "fronts," nine named fronts, and four
urban "militias."

c.    To further its terrorist activities and its
goals to overthrow the democratically elected Government of
Colombia, the FARC actively engages in narcotics trafficking as a
financing mechanism and has evolved into the world's largest
supplier of cocaine.

d.    In October 1997, the United States Secretary
of State designated the FARC as a foreign terrorist organization
pursuant to Section 219 of the Immigration and Nationality Act.
As of the date of filing of this Complaint, the FARC is currently
designated as a foreign terrorist organization.  The European
Union also has designated the FARC as a terrorist organization.

e.    During at least the five years prior to the
date of filing of this Complaint, the FARC has directed violent
acts against United States persons and commercial and property
interests in foreign jurisdictions, including, but not limited
to, Colombia.  In order to protect its financial interests in the
cocaine trade, the FARC leadership ordered its members to take
counter-measures against the Government of Colombia's cocaine
fumigation campaign, including, among other actions:   attempting
to shoot down fumigation aircraft; forcing members and supporters
to publicly rally against fumigation; and attacking Colombian
infrastructure.  Having recognized that the United States has
contributed significantly to Colombian fumigation efforts, the
FARC leadership ordered FARC members to kidnap and murder United
States citizens and to attack United States interests in order to
dissuade the United States from continuing its efforts to
fumigate and disrupt the FARC's cocaine and cocaine paste
manufacturing and distribution activities.

f.   The FARC's violent acts directed against the United States and United States interests have included: (1) the murder of United States nationals; (2) the kidnapping of United States nationals; and (3) the bombing of a restaurant in Bogota, Colombia, frequented by United States nationals.

## Al Qaeda and Al Qaeda in the Islamic Maghreb (AQIM)

9.   During the course of my investigation, I have become familiar with Al Qaeda and Al Qaeda in the Islamic Maghreb ("AQIM").  Based on my review of publicly available information, including findings and statements by the United States Department of State, the United States Department of Treasury, and the United Nations, as well as statements attributed to AQIM through newspapers, periodicals, and other "open source" information, I have learned the following:

a.   Al Qaeda is an organization founded in or about 1989 by Usama bin Laden, Muhammad Atef, a/k/a "Abu Hafs al Masri," and others.  One of the principal goals of this organization is to attack the United States.  Al Qaeda has claimed responsibility for the September 11, 2001 attacks in the United States and for numerous other terrorist acts around the world.  Al Qaeda functions on its own and through various terrorist organizations that operate under its umbrella, including, as described below, AQIM.

b.   The United States Department of State has designated Al Qaeda as a foreign terrorist organization ("FTO") on:  October 8, 1999; October 5, 2001; October 2, 2003; and April 28, 2006.  Al Qaeda remains a designated FTO as of this date. The designation is made pursuant to Section 219 of the Immigration and Nationality Act, as added by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 302, 110 Stat. 1214, 1248 (1996), and amended by the Illegal Immigrant Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009 (1996).

c.   AQIM formerly called itself the Salafist Group for Preaching and Combat ("GSPC").  This group was founded in the late 1990s with the assistance of Usama bin Laden, and declared war on Algeria's secular authorities and Western targets.  In or about September 2001, GSPC declared that it would "strike hard" at the United States and other countries if they "persist in hunting down Islamist networks in America, Great Britain, France, and Belgium."  On March 27, 2002, the United States Department of State designated GSPC as an FTO.  As of June 2004, Abdelmalek Droukdal, a/k/a "Abu Musab Abdul Wadoud," was appointed GSPC's leader.

d.   On or about September 11, 2006, Ayman al Zawahiri – a high-ranking member of Al Qaeda and close associate of Usama bin Laden – announced that GSPC had joined Al Qaeda.  In making this statement, Zawahiri called for "our brothers of the GSPC to hit the foundations of the Crusader alliance, primarily their old leader the infidel United States."  GSPC renamed itself AQIM, and declared its leader to be Abdelmalek Droukdal. In February 2008, the United States Department of State amended its earlier designation of GSPC as an FTO to include AQIM.

e.   On or about December 4, 2007, the United States Department of Treasury, pursuant to Executive Order 13224, designated Droukdal as a foreign terrorist.  In so designating Droukdal, the United States Department of Treasury stated that Droukdal had reportedly supervised April 2007 bombings of the Algerian Prime Minister's Office and police offices and ordered a December 2006 attack on a United States company's bus.

f.   In responding to questions posed to him by the New York Times in July 2008, Droukdal stated via audio recording that "American interests are legitimate targets to us. We will strive to strike them whenever we can.  And we are sure that America is going to lose its war against us like it lost it against Afghanistan and Iraq."  Droukdal further stated that:

- By uniting with Al Qaeda, AQIM "brought grief and sorrow to our enemies the Jews and apostates and crusaders."

- "We and Al Qaeda are one body. . . .  They back us up and we back them up.  They supply us and we supply them with any kind of support, loyalty, advice and available support."

- "Everyone must know that we will not hesitate in targeting [the United States] whenever we can and wherever it is on the planet."

- "We will mobilize the sons of the Islamic Maghreb in order to soak the nose of the Americans in the mud, and put into their account that's already filled with defeats, another defiance."

6

**The Investigation**

A.   **CS-1 Meets With Defendants ISSA and TOURÉ**
     **In Ghana In September And October of 2009**

10.   The DEA has been assisted in this investigation by
a confidential source ("CS-1") who has provided the DEA with
information about potential narco-terrorist activity in West
Africa.[1]  In CS-1's interaction with the targets of
investigation, CS-1 has posed as a Lebanese radical committed to
opposing the interests of the United States, Israel and, more
broadly, the West and its ideals.

11.   In August of 2009, CS-1 identified an individual
known as "Oumar," who was subsequently identified by the DEA as
OUMAR ISSA, the defendant, as a facilitator for a criminal
organization operating within the West African countries of Togo,
Ghana, Burkina Faso and Mali.  CS-1 reported the information to
the DEA and thereupon was instructed to arrange a meeting with
ISSA in Ghana, which CS-1 did, by telephone.   On September 14,
2009, CS-1 met ISSA in Ghana.  The meeting, which was conducted
in French, was recorded with audio and video equipment.  I have
set forth below a partial summary of the discussion held during
this meeting.  This summary is based upon my and other agents'
debriefings of CS-1, as well as my review of a summary
translation of the meeting prepared by a translator working on a
contract basis with the DEA.  During the meeting, the following
discussion took place:

a.   CS-1 told ISSA that he represented members of
the FARC.  CS-1 explained to ISSA that the Colombians were very
sympathetic to "the cause" and held anti-American views similar
to those of ISSA and to the views espoused by CS-1 (in CS-1's
cover as a Lebanese radical).  CS-1 told ISSA that working with
the Colombians would not only be profitable, but would generate
money for their shared causes.

b.   CS-1 explained that the Colombians needed
assistance with transporting cocaine from West Africa, through
North Africa, and into Spain.  To that end, CS-1 asked ISSA if he
was capable of providing secure passage of cocaine through North
Africa.

c.   ISSA explained that associates of his in Mali
have an established means to avoid customs detection of
contraband at the various borders along the proposed route and

---

[1]   CS-1 became a paid confidential source for DEA in
approximately July of 2009.  During the time CS-1 has worked for
DEA, CS-1 has proved reliable and has provided information that has
been independently corroborated.

were capable of ensuring safe passage through the desert.  The CS asked ISSA if the protection would come from government officials or from "Qaeda."  ISSA confirmed that the protection would come from Al Qaeda and the people that would protect the load would be very well armed.

        d.    To further the proposed transaction, ISSA stated that he would travel to Mali to meet with the "main guy." CS-1 and ISSA agreed that the two of them, joined by the "main guy" referenced by ISSA, would meet in Ghana soon to further discuss the details of the transaction.

        12.    On September 15 and 16, 2009, CS-1 made a series of consensually monitored telephone calls at the direction of DEA, during which CS-1 and OUMAR ISSA, the defendant, further discussed the cocaine transportation proposal previously discussed on September 14, 2009.  ISSA asked CS-1 for money to pay for his travel to Mali so that ISSA could meet with his boss and tell the boss about the business proposal with the Colombians.  CS-1 asked for ISSA's full name in order to send him money via Western Union.  ISSA provided his name, and the DEA arranged to have $300.00 sent to ISSA in Togo to pay for ISSA's travel to Mali.  Between September 16, 2009 and October 6, 2009, CS-1 made an additional series of recorded and unrecorded telephone calls with ISSA.  The calls focused on coordinating a meeting with ISSA's main contact in Mali.

        13.    On October 6, 2009, CS-1 had a series of meetings with ISSA and an individual subsequently identified as HAROUNA TOURÉ,[2] the defendant, in Accra, Ghana, to continue discussions regarding the proposed transport of cocaine through Africa. TOURÉ was introduced at the meeting as the boss of OUMAR ISSA, the defendant, and purported to lead a criminal organization that worked with groups in North Africa with affiliations to Al Qaeda. TOURÉ indicated that he had agreed to meet with CS-1 to discuss TOURÉ's ability to assist CS-1 and a representative of the FARC with the transportation of cocaine from Ghana through North Africa to the coast of Spain.  I have set forth below a partial summary of the discussion during this meeting.  This summary is

---

     [2]  HAROUNA TOURÉ, the defendant, traveled to Ghana for the meeting via a flight from Bamako, Mali to Lome, Togo and then traveled with ISSA by vehicle from Lome, Togo to Accra, Ghana. TOURÉ's airline ticket was purchased by CS-1 in the name of "Touré Harouna" which was the name provided by ISSA prior to HAROUNA's travel.  The name HAROUNA TOURÉ was later identified from a Mali passport which he mistakenly left behind at the hotel where the meeting took place.  CS-1 acquired custody of the passport, at the request of TOURÉ, and made a copy of the passport which was sent to DEA agents.  CS-1 then returned the passport to TOURÉ through a third party.

based upon my and other agents' debriefings of CS-1, as well as
my conferral with a DEA agent with French fluency who has
reviewed the recordings.  During the meetings, CS-1 and TOURÉ
discussed the following:

       a.   CS-1 explained that he was meeting with TOURÉ
on behalf of the FARC, which CS-1 named explicitly, and described
the organization as being sympathetic to their (CS-1's and
TOURÉ's) mutual cause.  CS-1 explained that the FARC needed
assistance with the transportation of cocaine from Ghana to the
sea of Spain.  CS-1 told TOURÉ that the FARC worked with other
Islamists that oppose American interests.

       b.   TOURÉ stated that his organization would be
able to transport the cocaine from Ghana through North Africa to
Spain.  TOURÉ explained that his group controls the desert and
advised that the route from Ghana to Mali was generally safe, but
that TOURÉ's assistance would be needed to secure safe passage
from Mali to Morocco.  While demonstrating with a map and making
notations thereon, TOURÉ explained that the transportation of the
cocaine from Mali across the desert to Morocco would be
facilitated by Al Qaeda groups utilizing Land Rover 4x4 vehicles.
TOURÉ discussed the option of two different transportation
routes, one through Algeria and Libya, and the other through
Algeria and Morocco.

       c.   TOURÉ also described his strong relationship
with the Al Qaeda groups that control areas of North Africa.
TOURÉ stated that he has worked with Al Qaeda to transport and
deliver between one and two tons of hashish to Tunisia and that
his organization and Al Qaeda have collaborated in the human
smuggling of Bangladeshi, Pakistani and Indian subjects into
Spain.  TOURÉ also explained that he supports Al Qaeda with
gasoline and food and collects taxes from many rich Malian people
throughout the region on Al Qaeda's behalf.  TOURÉ commented that
without him (TOURÉ) they (Al Qaeda) could not eat.  TOURÉ stated
that he understands the Colombians' hatred for the Americans
because the Americans do not let the Colombians rest.

       d.   CS-1 inquired about TOURÉ's ability and
interest in participating in kidnappings for ransom to raise
money.  TOURÉ stated that the same organization (Al Qaeda) that
will be protecting the cocaine shipment from Mali through North
Africa could assist CS-1 in CS-1's desire to kidnap foreign
nationals to raise money for the cause.  In an effort to support
his claim, TOURÉ elaborated that the same group recently
kidnapped French speaking Belgian citizens and successfully
collected a large ransom for their return.

       e.   TOURÉ further reported that he has a
longstanding working relationship with a Brazil-based criminal
organization that smuggles contraband.  TOURÉ advised that this

9

Brazilian organization has assisted him with obtaining visas for travel to Brazil and parts of Europe.[3]  TOURÉ advised that if CS-1 and the Colombians wanted the shipment of cocaine transported from the coast of Morocco to Spain, TOURÉ would utilize his Brazilian contact for that segment of the transportation.

   f. TOURÉ negotiated a transportation cost of $2,000 per kilogram of cocaine.  TOURÉ stated that the cost included payment to his Al Qaeda contacts for the transport and security of the cocaine through North Africa, across the desert, to the coast of Morocco.  TOURÉ further indicated that he was able to get official Mali passports.  CS-1 provided TOURÉ with a photo of a criminal associate (the "CA") and explained that the CA worked for the Colombians.  CS-1 advised that the CA would follow along with TOURÉ's group to ensure the safe delivery of the cocaine shipment.  CS-1 paid TOURÉ $1,000 for the future procurement of the passport for the CA.  TOURÉ stated that he would be able to obtain the CA's passport within 3-4 days after his return to Mali; however, TOURÉ warned that he would only allow the CA to follow the drug load until the load reached Mali and, once the load was turned over to Al Qaeda, they would not allow an outsider to follow them through North Africa.

   14. On October 15, 2009, CS-1 made a series of consensually monitored calls to HAROUNA TOURÉ, the defendant, at the direction of DEA.  During the calls, the substance of which I and other agents have reviewed with CS-1, TOURÉ agreed at the next meeting to bring a representative of the group that would be responsible for the security of the cocaine during transit through the desert of North Africa, from Mali to the coast, and agreed to meet in Melilla (a Spanish-controlled territory within Morocco) in the near future.  CS-1 asked TOURÉ for an e-mail address that CS-1 could use to contact TOURÉ; TOURÉ provided an account address and CS-1 gave TOURÉ CS-1's email account information.  CS-1 and TOURÉ subsequently exchanged a series of e-mails in French (with some Arabic terms), including the following:[4]

   a. On or about October 16, 2009, at approximately 10:42 a.m., CS-1 wrote "I am happy to get in touch with you.  Today, I will contact the Colombians through this same way and I will let you know all the details in regards to our business/deal.  Everything is going on the right direction."

---

  [3] TOURÉ's Malian passport reflected travel to Brazil, Saudi Arabia and France.

  [4] The English translations of TOURÉ's e-mails are preliminary translations prepared by DEA personnel with French language fluency.

   b. At approximately 6:00 p.m. later that day,
CS-1 wrote "Dear Touré, we are going on the right direction and
God is going to be with us.  Our next meeting with the Colombians
will be in Mellia [sic] 'Inchaallah' [meaning 'God willing' in
Arabic] and don't worry about the expenses because I am going to
take care of it.  The Colombians are going to send a
representative and he is going to be in charge of verifying
everything I have presented him about the transportation.  So you
have to take with you the person who is going to be responsible
to protect the merchandise, especially in the desert where our
friends, the radicals and the Muslims are going to be the
'guarantee' for the people as we have talked and concluded in our
last meeting.  We are going to start the action and the execution
of the plan.  I know that you are the 'desert' and I trust you.
I think we are going to do a good job and also we are going to
help with our brothers our cause which is under any other
consideration.  God is with us; he watches over us and he guides
us. . . .  Once the passport is done you will give it to me, God
willing, in our next meeting.  I forgot to tell you that with the
passport, it is necessary an identification card and a driver's
license that I will pay you separately.  The load will be ready
and that's why we have to study well the route.  We will talk
also in Mellia [sic], God willing.  By the way, the Colombians
are going to make you an offer, a good business and we will talk
about that also.  God bless you and [Arabic terms] Good bye."

   c. On or about October 16, 2009, TOURÉ responded
at approximately 8:06 a.m., "Hello, I received the message and
[Unintelligible word] is understood.  So far, I would like you to
give me the exact date of our next meeting because I am not
permanently in the Capital because I operate most of the time on
the north, in the areas where there aren't connections.  Since we
have been in contact I have made all the necessary contacts with
our Muslim brothers in order for the deal to work.  Every day
they ask about the deal; there is not a problem to bring one
person but he is in the 'desert' and I don't know what to say; to
come, or not to come.  I don't have any concerns with the deal
because I am convinced.  What it worries me a little bit is that
I have a lot of work and I don't know when this is going to
start.  God help us and take care."

   d. On October 17, 2009 at approximately 4:36
p.m., CS-1 sent an email to TOURÉ and asked him if TOURÉ's
partner would be available to come to a future meeting.  At
approximately 7:41 p.m., TOURÉ sent CS-1 the response, in French:
"Hello, the message has been received.  It won't be a problem for
my partner.  I will wait until Monday to make plans.  Wish you
good things."

11

B.   CS-1 and CS-2 Meet With Defendants TOURÉ
     And ABELRAHMAN In Ghana In November 2009

         15.   On November 17 and 18, 2009, CS-1 and an
additional DEA confidential source posing as a member of the FARC
("CS-2")[5] met with HAROUNA TOURÉ and IDRISS ABELRAHMAN, the
defendants, in Ghana in meetings that were recorded on both audio
and video.[6]  This summary is based upon my and other agents'
debriefings of CS-1, as well as my review of a summary
translation of the meeting prepared by a translator working on a
contract basis with the DEA.  During the meeting, the following
discussion took place:

         a.   At the outset of the meeting, ABELRAHMAN
said, in substance, that each party knew who the other party was,
and it need not be discussed further.  CS-2 introduced himself as
a high-ranking member of his organization interested in shipping
a series of 500 to 1,000 kilogram loads of cocaine across Africa
to Europe.  CS-2 explained that he and his group had been
fighting a war against the Americans, Colombians, and many other
governments for a very long time.  CS-2 further explained that to
finance this war, his organization generated money from the sale
of cocaine.  ABELRAHMAN was introduced as a leader of a "militia"
of 11 armed men and told CS-1, in substance, that he was "wanted
by the world" because of his status as a "General" in the
militia, and that because of his status he could not travel in
Europe.  TOURÉ and ABELRAHMAN identified themselves as the
"kings" of the desert and described themselves as "warriors of
god and fighting for god."  When CS-2 challenged ABELRAHMAN by
stating that ABELRAHMAN leads only 11 men, whereas CS-2's
organization is comprised of 30,000 men, ABELRAHMAN smiled and
said "we are everywhere."  CS-1 explained to ABELRAHMAN in
substance that CS-2 hates Americans and that Americans killed CS-
2's brother.  ABELRAHMAN responded by pointing to CS-2 and
saying, in substance, that if this was the case, that CS-2 was
now ABELRAHMAN's brother.  CS-1 told TOURÉ and ABELRAHMAN, in
substance, that he/she knows that CS-2 is glad to be working with
TOURÉ and ABELRAHMAN because they all hate Americans and are
committed to the same cause.  ABELRAHMAN then responded "god
willing, god willing."

_____

         [5]   CS-2 has been working with the DEA since 2000, first as
a cooperating witness and currently as a paid confidential source.
CS-2 has provided reliable information in the past that has
resulted in numerous arrests, seizures, and convictions.  CS-2 has
also previously testified in United States District Court.

         [6]   During the meetings, CS-2 spoke in Spanish, using CS-1 as
an interpreter to convert the substance of his statements into
French.

                              12

b.    During the meetings, TOURÉ and ABELRAHMAN said that they have the ability to safely transport cocaine shipments for CS-2 and his group.  ABELRAHMAN said that TOURÉ handles the business aspects of the operation and possesses useful political contacts in Mali, while ABELRAHMAN's role is to provide weapons and to use his status in the "militia" to ensure safe passage of merchandise through the desert, adding that ABELRAHMAN's people possess the force, the weapons, and the vehicles to do so.  TOURÉ explained that he would use a truck to transport the cocaine from Ghana to Mali or Niger.  At that point TOURÉ would combine efforts with ABELRAHMAN and his group to transport the cocaine through the desert to the coast of Morocco, through the small Moroccan coastal town of Aghadir, and then via a route the passes through a river out to the Canary Islands. TOURÉ and ABELRAHMAN said that they would charge 3,000 Euros per kilogram that they transport and would request a 10% down payment prior to each transport.  According to TOURÉ and ABELRAHMAN, this money was needed to cover various expenses, including vehicles, gas, water, and payments to people working with their organization, among other things.  TOURÉ and ABELRAHMAN said that the profits of the work will go to their people to support the fight for "the cause."

16.   During a meeting in Ghana that took place on or about November 18, 2009, CS-1 and CS-2 told HAROUNA TOURÉ and IDRISS ABELRAHMAN, the defendants, that CS-2 spoke to other leadership members of his organization and that they decided that they wanted TOURÉ and ABELRAHMAN to purchase the truck that will be used to transport the cocaine shipments from Ghana to ABELRAHMAN's group in the desert.  CS-1 and CS-2 then handed $25,000 to TOURÉ and ABELRAHMAN.  ABELRAHMAN initially picked up the money and placed it in his left pants pocket.  Later during the meeting, ABELRAHMAN handed the money to TOURÉ and TOURÉ counted the money.  TOURÉ advised that he would purchase the truck for the operation.  During the discussions about the truck and the transportation operation, CS-1 and CS-2 explained to TOURÉ and ABELRAHMAN that the cocaine would be concealed in construction material and would be undetectable until it is processed at a lab located in Europe.

C.    CS-1, CS-2, TOURÉ and ABELRAHMAN Continue To
      Plan The Narcotics Transaction By Telephone

17.   Following the meetings on November 17, 2009 and November 18, 2009, CS-1 and CS-2 spoke to HAROUNA TOURÉ and IDRISS ABELRAHMAN, the defendants, in a subsequent series of recorded calls to TOURÉ and ABELRAHMAN to further plan and coordinate the proposed narcotics trafficking activity.  I have set forth below a partial summary of these calls, which is based on my debriefings of CS-1.  For example:

13

       a.   On or about November 18, 2009, at
approximately 10:05 a.m., CS-1 called TOURÉ and told him that
CS-1 and CS-2 wanted to meet with TOURÉ and ABELRAHMAN in a half
an hour.   CS-1 stated that "so far, everything seems good,"
referring to the parties' conversations the previous day in which
CS-1 and CS-2 told TOURÉ and ABELRAHMAN that they would be in
contact with CS-2's partners in Colombia (the FARC) to get
approval to move forward.   TOURÉ stated that he was checking out
of his hotel room.   TOURÉ told CS-1 to come to the hotel so that
they could meet again.

       b.   On that same day, on or about November 18,
2009, CS-1 called TOURÉ told him that he and ABELRAHMAN needed to
purchase a truck, not a car, with the $25,000 CS-1 and CS-2 had
provided them.   During the meeting on November 18, 2009, TOURÉ
and ABELRAHMAN indicated that they would purchase a four wheel
drive vehicle or "4x4" to transport the initial small load.   At
the direction of DEA, CS-1 called TOURÉ and clarified that that
the vehicle needed to be large enough to carry the 500 kilogram
loads that would be sent after an initial smaller load was
delivered and successfully transported.   During the call, TOURÉ
repeated that they would buy a truck and it would be better than
a 4x4.   CS-1 stated that once TOURÉ purchased the truck, CS-1 and
CS-2 would make the down payment for the transportation of the
initial load.   CS-1 told TOURÉ to take his time and not to rush
anything because CS-2 would be returning to South America to make
preparations for the 500 kilograms of cocaine to be sent to
Ghana.   During the call, CS-1 repeated "500" to make sure that
TOURÉ understood.   TOURÉ repeated the amount and CS-1 explained
that they needed to have a truck but told TOURÉ to take his time.
CS-1 explained that he would be going to Spain to prepare to
receive the cocaine near the "Island" (a reference to the Canary
Islands discussed in the prior meetings).   TOURÉ stated that he
understood that both CS-1 and CS-2 were leaving Ghana and that he
would be returning to Mali.   CS-1 explained that it would
possibly be 15 days before they meet again and that everybody was
leaving the area to take care of their own part of the
"business."   TOURÉ said that he would return to Mali.

       c.   A few minutes later, CS-1 again spoke to
TOURÉ.   CS-1 explained that CS-2 is preparing "the 500."   CS-1
informed TOURÉ that CS-2 would be away for at least 15 days and
CS-1 would be traveling to Spain to prepare for the transfer of
cocaine in North Africa.   CS-1 asked TOURÉ to assure CS-1 that he
would have the truck in 10 to 15 days and would purchase the
truck in Ghana or Mali.   The call was then dropped.   TOURÉ
immediately called CS-1 back and told CS-1 that he would see if
he could purchase the truck in Ghana before he departed.   CS-1
said that God would be with TOURÉ.

d.   On or about November 19, 2009, at
approximately 5:20 pm, CS-1 spoke to TOURÉ, who stated that he
and ABELRAHMAN were leaving for Mali early the following morning.
CS-1 told TOURÉ that he wanted to speak with ABELRAHMAN, and a
few minutes later CS-1 received an incoming call from ABELRAHMAN.
During the call, CS-1 asked that ABELRAHMAN conduct their part of
the business with caution.   CS-1 also instructed ABELRAHMAN to
speak with TOURÉ if he wanted to get a European passport because
of ABELRAHMAN's previous statements that ABELRAHMAN could not
travel in Europe because of his wanted status; CS-1 had told
TOURÉ and ABELRAHMAN that CS-1 had contacts that could obtain
official government passports for them so that they could more
freely travel.

e.   On or about November 30, 2009, CS-1 spoke
with ABELRAHMAN and TOURÉ by phone.   During this call, ABELRAHMAN
and TOURÉ indicated that they were ready, that they had purchased
the vehicle, and that they were waiting for further direction.
CS-1 was also told that TOURÉ would be leaving the following day
for Burkina Faso.   CS-1 also asked TOURÉ during the call whether
the recent kidnapping of a Spanish national in Mauritania would
complicate the movement of the cocaine through North Africa.
TOURÉ replied that the kidnapping and government efforts in the
area would not interfere with their group's movements and the
route that they intended to use.   TOURÉ also stated that a plane
had recently crashed in Mali that contained merchandise from
Colombia.   TOURÉ stated that the Mali desert was very large and
had five borders, and that many armed groups moved freely within
Mali, and again assured CS-1 that none of the recent events in
Mali would disrupt their transportation ability through the
desert.   Finally, TOURÉ stated that he and ABELRAHMAN wanted to
be paid in euros, rather than dollars.

f.   On or about December 3, 2009, CS-1 placed a
consesually-monitored and recorded call to TOURÉ.   During the
call, TOURÉ told CS-1 that he had purchased a truck, which he
described as a Mercedes six-wheeler, and that the truck was
already in Ghana.

D.   <u>CS-1 and CS-2 Meet With TOURE and
     ABELRAHMAN In Ghana In December 2009</u>

18.   On or about December 13, 2009, CS-1 and CS-2 met
with HAROUNA TOURÉ and IDRISS ABELRAHMAN, the defendants, in two
separate meetings in Ghana, both of which were recorded on audio
and video.

a.   In the first meeting, TOURÉ handed over the
Mali passport, as well as a government identification card, that
CS-1 had asked him to obtain for the CA.   TOURÉ and ABELRAHMAN
then explained that they did not have the truck with them that
they had purchased for the transport of the cocaine, because it

15

was being outfitted with higher sides in order to better conceal
the load of cocaine. TOURÉ and ABELRAHMAN further stated that,
in light of the alterations needed for the truck, an additional
$15,000 would be necessary to pay for the changes. They
explained that they could have the truck ready as early as the
next day, and gave a set of keys to the truck to CS-1 and showed
CS-1 and CS-2 a picture of the truck taken on TOURÉ's cellular
phone.

      b.    TOURÉ then asked that CS-1 and CS-2 pay half
of the transportation costs in advance, as a down payment. When
CS-1 responded that the previous understanding had been that only
a 10% down payment was necessary, TOURÉ responded that a 10% down
payment would not even cover the costs and expenses of the
transportation, including payouts to various people along the
route, and that the standard rate for transport across the desert
was $10,000 per kilogram of cocaine, reiterating their demand for
75,000 euros in down payment. TOURÉ told CS-1 and CS-2 that the
load could still be moved on the same schedule if CS-1 and CS-2
went to the garage, paid the remainder of the purchase price of
the truck, and delivered it to ABELRAHMAN, who would then pick up
the cocaine and begin the transport, while TOURÉ remained in
Accra to wait to receive the down payment. CS-1 and CS-2
answered that they could not deliver 75,000 euros without getting
permission and assistance from associates in Colombia, and
concluded the meeting to discuss among themselves what action to
take.

      c.    Later that day, CS-1 and CS-2 met again with
TOURÉ and ABELRAHMAN. During the meeting, CS-1 and CS-2
explained that the cocaine had been delivered to Ghana and asked
TOURÉ and ABELRAHMAN to transport the cocaine with 15,000 euros
as the down payment, noting that this initial load was a smaller
test load, and that there would be many future loads. They
further explained that if TOURÉ and ABELRAHMAN were insisting on
75,000 euros as the down payment, that CS-1 and CS-2 would need
time to get the money. TOURÉ responded that because he and
ABELRAHMAN had already incurred significant travel and hotel
expenses, the 75,000 euro down payment was necessary, but that he
and ABELRAHMAN would be willing to wait in Ghana for three days –
until Wednesday, December 16 – so that CS-1 and CS-2 could make
arrangements to provide the requested down payment. CS-1 and
CS-2 then left the meeting.

      19.    On or about December 14, 2009, CS-1 and CS-2 met
with HAROUNA TOURÉ and IDRISS ABELRAHMAN, the defendants, in
Ghana. The meeting was recorded on both audio and video.

      a.    At the beginning of the meeting, referencing
their meeting the previous day, CS-1 told ABELRAHMAN and TOURÉ
that CS-2 had been on the telephone the entire night explaining
the negotiations to his bosses, and that CS-2 and his

organization (referring to the FARC) had agreed to pay the money that ABELRAHMAN and TOURÉ had requested. TOURÉ then explained that he had been upset about their discussions the previous day because he and ABELRAHMAN had made substantial preparations for the cocaine transport on the understanding that an agreement had been reached and the plan was moving forward. TOURÉ explained, in substance, that he had traveled to the frontier of Morocco; that he had purchased the off-road vehicles that would be used to transport the cocaine in the Sahara, and that he had prepared people all along the transportation route to assist them, including in Niger. TOURÉ continued that he had also brought a friend who was a chauffeur that drives trucks for "our people, Al Qaeda" through the desert. TOURÉ said that he paid for all of the expenses with his own money and he had been very agitated about that during the negotiations on December 13. CS-1 admitted that he was agitated as well. ABELRAHMAN interjected and explained, in substance, that with a good heart, both parties could make the deal successful. Later in the meeting, CS-1 began to speak with ABELRAHMAN in Arabic, and told him that CS-2 is from "the FARC" and that CS-2's thinking is "military" like ABELRAHMAN's thinking. CS-1 elaborated that CS-2 and ABELRAHMAN have the same cause, stating that both ABELRAHMAN's group and CS-2's group are "against Americans," to which ABELRAHMAN nodded his head in assent.

b.   TOURÉ continued to explain that his aggravation the previous day was due to the fact that he had already begun to pay for the people and protection necessary to accomplish the cocaine transportation venture with CS-1 and CS-2 and had brought another member of Al Qaeda with him to Accra who could help ABELRAHMAN transport the cocaine along the route. TOURÉ explained that ABELRAHMAN and the other Al Qaeda member would be able to navigate through the region and they together had already established a route and a cover story to deal with complications and questions along the route. TOURÉ went on to explain that their group provides protection for airplanes that land in their area, including incoming planes from Colombia.

c.   CS-1 stated that CS-1 would be able to meet with TOURÉ and ABELRAHMAN tomorrow to make the final payment for the truck and take possession of it. TOURÉ said that they had secured a location where they could remove the cocaine from the truck and then place an additional cover load on the cocaine with help from people from their group located in Ghana. TOURÉ stated that he would place bananas or oranges on the load as additional "camouflage". TOURÉ explained that he had prepared the "military people" that would be assisting them. TOURÉ clarified that the "military people" were "Al Qaeda."

d.   Lastly, CS-1 again spoke with ABELRAHMAN in Arabic and, intertwining the fingers of his two hands, said that his group and ABELRAHMAN's group "would be like this – the two

organizations together." ABELRAHMAN made the same gesture with
his hands and affirmed that the two organizations are coming
together.  ABELRAHMAN then brought his fist and hand together and
said "god willing."

    WHEREFORE, your deponent respectfully requests that
arrest warrants be issued for OUMAR ISSA, HAROUNA TOURÉ, and
IDRISS ABELRAHMAN, the defendants, and that they be arrested and
imprisoned, or bailed, as the case may be.

DEC 1 5 2009

_____
DARIA LUPACCHINO
Special Agent
Drug Enforcement Administration

Sworn to before me this
15 day of December, 2009

_____
THE HONORABLE KEVIN N. FOX
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

18

# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - -x
                                  :
UNITED STATES OF AMERICA          :
                                  :
        - v. -                    :
                                  :
OUMAR ISSA,                       :      09 Cr.
HAROUNA TOURÉ, and                :
IDRISS ABDELRAHMAN,               :
                                  :      09 CRIM 1244
        Defendants.              :
- - - - - - - - - - - - - - - - -x

## COUNT ONE

### NARCO-TERRORISM CONSPIRACY

The Grand Jury charges:

### BACKGROUND TO THE CONSPIRACY

#### *Fuerzas Armadas*
#### *Revolucionarias de Colombia*

1.    From in or about 1964 until on or about the date
of filing of this Indictment, the Fuerzas Armadas Revolucionarias
de Colombia (the "Revolutionary Armed Forces of Colombia" or
"FARC") has been and is an international terrorist group
dedicated to the violent overthrow of the democratically elected
Government of Colombia.  To further its terrorist activities, the
FARC actively engages in narcotics trafficking as a financing
mechanism and has evolved into the world's largest supplier of
cocaine.  The FARC is a highly structured terrorist organization,
which is styled as a military group and comprised of
approximately 12,000 to 18,000 armed guerillas.

2.     The FARC was designated as a foreign terrorist organization ("FTO") in October 1997 by the United States Secretary of State and remains so designated as of the date of the filing of this Indictment.

3.     During at least the five years prior to the date of the filing of this Indictment, the FARC has directed violent acts against United States persons and commercial and property interests in foreign jurisdictions, including, but not limited to, Colombia.  In particular, the FARC leadership has ordered FARC members to kidnap and murder United States citizens and to attack United States interests in order to dissuade the United States from continuing its efforts to assist the Colombian government's initiative to fumigate and disrupt the FARC's cocaine and cocaine paste manufacturing and distribution activities.  The FARC's violent acts directed against the United States and United States interests have included: (1) the murder of United States nationals; (2) the kidnapping of United States nationals; and (3) the bombing of a restaurant in Bogota, Colombia, frequented by United States nationals.

### Al Qaeda and
### Al Qaeda in the Islamic Maghreb

4.     Al Qaeda is an organization founded in or about 1989 by Usama bin Laden, Muhammad Atef, a/k/a "Abu Hafs al Masri," and others.  One of the principal goals of this organization is to attack the United States.  Al Qaeda has

-2-

claimed responsibility for the September 11, 2001 attacks in the United States and for numerous other terrorist acts around the world. Al Qaeda functions independently and through various terrorist organizations that share its ideology and operate under its umbrella, including, as described below, Al Qaeda in the Islamic Maghreb ("AQIM"), which operates primarily in Northwest Africa.

5.   On October 8, 1999, the United States Secretary of State designated Al Qaeda as an FTO, and Al Qaeda remains a designated FTO as of the date of the filing of this Indictment.

6.   AQIM was formerly known as the Salafist Group for Preaching and Combat ("GSPC"). This group was founded in the late 1990s with the assistance of Usama bin Laden, and declared war on Algeria's secular authorities and Western targets. In or about September 2001, GSPC declared that it would "strike hard" at the United States and other countries if they "persist in hunting down Islamist networks in America, Great Britain, France, and Belgium." On March 27, 2002, the United States Secretary of State designated GSPC as an FTO, pursuant to Section 219 of the Immigration and Nationality Act.

7.   On or about September 11, 2006, Ayman al Zawahiri – a high-ranking member of Al Qaeda and close associate of Usama bin Laden – announced that GSPC had joined Al Qaeda. In making this statement, Zawahiri called for "our brothers of the GSPC to hit the foundations of the Crusader alliance, primarily their old

leader the infidel United States."  GSPC renamed itself AQIM, and

in or about February 2008, the United States Secretary of State

amended the earlier designation of GSPC as an FTO to include

AQIM.

<u>STATUTORY ALLEGATIONS</u>

  8. From at least in or about September 2009, up to

and including in or about December 2009, in an offense occurring

in and affecting interstate and foreign commerce, begun and

committed outside of the jurisdiction of any particular State or

district of the United States, OUMAR ISSA, HAROUNA TOURÉ, and

IDRISS ABDELRAHMAN, the defendants, who were first brought to and

arrested in the Southern District of New York, and others known

and unknown, unlawfully, intentionally and knowingly did combine,

conspire, confederate and agree together and with each other to

violate the laws of the United States.

  9. It was a part and an object of said conspiracy

that OUMAR ISSA, HAROUNA TOURÉ, and IDRISS ABDELRAHMAN, the

defendants, and others known and unknown, would and did engage in

conduct that would be punishable under Title 21, United States

Code, Section 841(a) if committed within the jurisdiction of the

United States, to wit, the distribution, and possession with the

intent to distribute, of five kilograms and more of mixtures and

substances containing a detectable amount of cocaine, knowing and

intending to provide, directly and indirectly, something of

-4-

pecuniary value to a person and organization that has engaged and

engages in terrorist activity and terrorism, to wit, the FARC,

which was designated by the United States Secretary of State as a

foreign terrorist organization in October 1997, pursuant to

Section 219 of the Immigration and Nationality Act, and was

re-designated as such on October 2, 2003, and October 11, 2005,

and is currently designated as such as of the date of the filing

of this Indictment, and its members, operatives and associates,

in violation of Section 960a of Title 21, United States Code.

    10.   It was further a part and an object of said

conspiracy that OUMAR ISSA, HAROUNA TOURÉ, and IDRISS

ABDELRAHMAN, the defendants, and others known and unknown, would

and did engage in conduct that would be punishable under Title

21, United States Code, Section 841(a) if committed within the

jurisdiction of the United States, to wit, the distribution, and

possession with the intent to distribute, of five kilograms and

more of mixtures and substances containing a detectable amount of

cocaine, knowing and intending to provide, directly and

indirectly, something of pecuniary value to a person and

organization that has engaged and engages in terrorist activity

and terrorism, to wit, (a) Al Qaeda, which was designated by the

United States Secretary of State as a foreign terrorist

organization on October 8, 1999, pursuant to Section 219 of the

Immigration and Nationality Act, and was re-designated as such on

October 5, 2001, October 2, 2003, and April 28, 2006, and is
currently designated as such as of the date of the filing of this
Indictment, and its members, operatives and associates, in
violation of Section 960a of Title 21, United States Code; and
(b) AQIM, which was designated by the United States Secretary of
State as a foreign terrorist organization in February 2008,
pursuant to Section 219 of the Immigration and Nationality Act,
and is currently designated as such as of the date of the filing
of this Indictment, and its members, operatives and associates,
in violation of Section 960a of Title 21, United States Code.

<u>Overt Acts</u>

     11.  In furtherance of the conspiracy and to effect the
illegal objects thereof, the following overt acts, among others,
were committed:

     a.  On or about September 14, 2009, in Ghana, a
DEA confidential source ("CS-1") purporting to represent the
FARC, met with OUMAR ISSA, the defendant, to discuss whether ISSA
could assist the FARC in transporting a large load of cocaine
from West Africa, through the African desert, and into Spain.
ISSA stated that his associates in Mali have established routes
to transport contraband and confirmed that the routes are
protected by Al Qaeda.  During the meeting, CS-1 explained to
ISSA that the FARC shared the same anti-American views held by
ISSA and stated that the proposed cocaine transportation

-6-

arrangement would be profitable and would help to finance their
shared causes.

        b.   On or about September 15, 2009 and September
16, 2009, CS-1 and ISSA engaged in a series of telephone calls in
which they further discussed the proposed cocaine shipment, which
ISSA said he would discuss with his boss.

        c.   On or about October 6, 2009, in Ghana, CS-1
met with ISSA and HAROUNA TOURÉ, the defendant, on multiple
occasions.  In the meetings, TOURÉ, whom ISSA introduced as his
boss, informed CS-1 that TOURÉ's organization would be able to
secure safe passage of the FARC's cocaine from Mali to Morocco,
and that the transportation of the cocaine across the desert
would be facilitated by Al Qaeda groups in North Africa.  TOURÉ
stated that he led a criminal organization that worked with Al
Qaeda groups, and that he also provides financial support and
other assistance to Al Qaeda.  TOURÉ further stated that he
understood the FARC's hatred for the Americans.  TOURÉ negotiated
a transportation fee from CS-1 of $2,000 per kilogram of cocaine,
which included payment to TOURÉ's Al Qaeda contacts for the
transport and security of the cocaine through North Africa.
TOURÉ also told CS-1 that he could obtain official Malian
passports.  At the request of CS-1, TOURÉ offered to provide a
Malian passport for a criminal associate of CS-1 (the "CA"), whom
TOURÉ agreed could accompany the cocaine shipment as far as Mali.

d.   On or about October 16 and October 17, 2009, CS-1 and TOURÉ exchanged a series of e-mails to further arrange a a meeting between a purported high-ranking member of the FARC and a representative of the group that would protect the cocaine in transit through the desert.

e.   On or about November 17 and November 18, 2009, CS-1 and a second DEA confidential source ("CS-2"), who purported to be a high-ranking member of the FARC interested in shipping a series of cocaine loads of 500 to 1000 kilograms across Africa to Europe, met in Ghana with TOURÉ and IDRISS ABDELRAHMAN, the defendant, who was introduced to CS-1 and CS-2 as the leader of a militia.  During the meetings, TOURÉ explained to CS-1 and CS-2 that he would use a truck to transport the cocaine from Ghana to Mali or Niger, where he would meet with ABDELRAHMAN and his militia, who would then provide safe passage of the cocaine through the desert to the coast of Morocco. ABDELRAHMAN stated that his people had the force, weapons, and vehicles necessary to do so.  TOURÉ and ABDELRAHMAN also informed CS-1 and CS-2 that they would charge them 3,000 euros per kilogram to transport the cocaine, a cost that would cover, among other things, payments to people responsible for protecting the drug shipment in the desert.  During the meetings, CS-1 and ABDELRAHMAN discussed their shared hatred of Americans and their commitment to a mutual cause.

-8-

f.    On or about November 18, 2009, in Ghana, CS-1
and CS-2 provided TOURÉ and ABDELRAHMAN with $25,000 to purchase
a truck that would be used to transport the cocaine across the
desert.

g.    On or about November 18, 2009, and November
19, 2009, CS-1 and CS-2 engaged in a series of telephone calls
with TOURÉ and ABDELRAHMAN to further plan and coordinate the
proposed cocaine shipments.

h.    On or about November 30, 2009, TOURÉ and
ABDELRAHMAN informed CS-1 by telephone that they had purchased a
truck to transport the cocaine, and that the recent kidnaping of
a Spanish national in Mauritania and the recent discovery of a
large amount of cocaine in an airplane that had crashed in Mali
would not interfere with their plan to transport the FARC's
cocaine through the desert.

i.    On or about December 13, 2009, TOURÉ and
ABDELRAHMAN met with CS-1 and CS-2 in Ghana and informed them
that they needed an additional 15,000 euros to make modifications
to the truck they had purchased in order to better conceal the
load of cocaine.   TOURÉ and ABDELRAHMAN also stated that they
required 75,000 euros as a down payment for the shipment.   TOURÉ
also provided CS-1 and CS-2 with a Malian passport and a Malian
government identification card for the CA, which would enable the
CA to accompany the cocaine shipment to Mali, as previously

-9-

discussed.

        j.   On or about December 14, 2009, TOURÉ and ABDELRAHMAN met with CS-1 and CS-2 in Ghana.  During the meeting, TOURÉ explained that he and ABDELRAHMAN had made substantial preparations for the cocaine transportation including the purchase of off-road vehicles to move the cocaine through the desert and the preparation of people along the transportation route who would assist with the transportation.  TOURÉ also stated that he had brought to Ghana a driver who works for Al Qaeda who would help drive the vehicles through the desert.

        k.   On or about December 15, 2009, CS-1 and CS-2 met with TOURÉ and ABDELRAHMAN at a car lot in Ghana to inspect the truck that TOURÉ and ABDELRAHMAN had purchased to transport the cocaine.  CS-1 and CS-2 provided TOURÉ and ABDELRAHMAN with the 15,000 euros that they had previously requested to modify the truck, and agreed to meet the following day in order to load the cocaine onto the truck.

(Title 21, United States Code, Section 960a and Title 18, United States Code, Section 3238.)

COUNT TWO

CONSPIRACY TO PROVIDE MATERIAL SUPPORT
TO A FOREIGN TERRORIST ORGANIZATION

The Grand Jury further charges:

BACKGROUND TO THE CONSPIRACY

12.   Paragraphs 1 through 7 are incorporated herein as
if re-alleged in full.

STATUTORY ALLEGATIONS

13.   From at least in or about September 2009, up to
and including in or about December 2009, in an offense occurring
in and affecting interstate and foreign commerce, begun and
committed outside of the jurisdiction of any particular State or
district of the United States, OUMAR ISSA, HAROUNA TOURÉ, and
IDRISS ABDELRAHMAN, the defendants, who were first brought to and
arrested in the Southern District of New York, and others known
and unknown, unlawfully and knowingly did combine, conspire,
confederate and agree together and with each other to provide
"material support or resources," as that term is defined in Title
18, United States Code, Section 2339A(b), to the FARC, Al Qaeda,
and AQIM, each of which has been designated by the United States
Secretary of State as a foreign terrorist organization, as set
forth above.

14.   It was a part and an object of the conspiracy that
OUMAR ISSA, HAROUNA TOURÉ, and IDRISS ABDELRAHMAN, the
defendants, and others known and unknown, would and did agree to

-11-

provide the FARC with services, including, among other things, logistical assistance and secure transportation for a shipment of cocaine across Africa, false identification documents, and other material support and resources, knowing that the FARC had engaged and was engaging in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), and that the FARC had engaged and was engaging in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989), in violation of Title 18, United States Code, Section 2339B.

15.    It was further a part and an object of the conspiracy that OUMAR ISSA, HAROUNA TOURÉ, and IDRISS ABDELRAHMAN, the defendants, would and did agree to provide material support and resources, including, among other things, property, currency, and monetary instruments, to Al Qaeda and AQIM, knowing that Al Qaeda and AQIM had engaged and were engaging in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), and that Al Qaeda and AQIM had engaged and were engaging in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989), in violation of Title 18, United States Code, Section 2339B.

-12-

<u>Overt Acts</u>

16.   In furtherance of the conspiracy and to effect the illegal object thereof, OUMAR ISSA, HAROUNA TOURÉ, and IDRISS ABDELRAHMAN, the defendants, and others known and unknown, committed the overt acts set forth in paragraph 11 of this Indictment, which are fully incorporated by reference herein.

(Title 18, United States Code, Sections 2339B(a)(1), (d)(1)(C),
(d)(1)(E) and 3238.)

<u>FORFEITURE ALLEGATION</u>

(As to Count One)

17.   As a result of committing the controlled substance offense alleged in Count One of this Indictment, OUMAR ISSA, HAROUNA TOURÉ, and IDRISS ABDELRAHMAN, the defendants, shall forfeit to the United States, pursuant to Title 21, United States Code, Sections 853 and 970, any and all property constituting or derived from any proceeds that the defendants obtained directly or indirectly as a result of the offense and any and all property used or intended to be used in any manner or part to commit and to facilitate the commission of the offense alleged in Count One of this Indictment, including, but not limited to, a sum of money representing the amount of proceeds obtained as a result of the offense described in Count One of this Indictment.

-13-

<u>Substitute Assets Provision</u>

18.   If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendants:

      a.   cannot be located upon the exercise of due diligence;

      b.   has been transferred or sold to, or deposited with, a third person;

      c.   has been placed beyond the jurisdiction of the Court;

      d.   has been substantially diminished in value; or

      e.   has been commingled with other property which cannot be subdivided without difficulty;

it is the intention of the United States, pursuant to Title 21, United States Code, Sections 853(p) and 970, to seek forfeiture of any other property of the defendants up to the value of the above forfeitable property.

(Title 21, United States Code, Sections 853 and 970.)

<u>FORFEITURE ALLEGATION</u>

(As to Count Two)

19.   As a result of planning and perpetrating the Federal crime of terrorism against the United States, citizens and residents of the United States, and their property alleged in

-14-

Count Two of this Indictment, OUMAR ISSA, HAROUNA TOURÉ, and
IDRISS ABDELRAHMAN, the defendants, shall forfeit to the United
States, pursuant to Title 18, United States Code, Sections
981(a)(1)(G) and 2332b(g)(5), and Title 28, United States Code,
Section 2461:

  a.  all right, title, and interest in all assets,
      foreign and domestic;

  b.  all right, title, and interest in all assets,
      foreign and domestic, affording a source of
      influence over the FARC, Al Qaeda, and AQIM;

  c.  all right, title and interest in all assets,
      foreign and domestic, acquired and maintained
      with the intent and for the purpose of
      supporting, planning, conducting, and
      concealing a Federal crime of terrorism
      against the United States, citizens and
      residents of the United States, and their
      property; and

  d.  all right, title and interest in all assets,
      foreign and domestic, derived from, involved
      in, and used and intended to be used to
      commit a Federal crime of terrorism against
      the United States, citizens and residents of
      the United States, and their property;

-15-

including, but not limited to, a sum of money representing the
value of the property described above as being subject to
forfeiture.

    (Title 18, United States Code, Section 981(a)(1)(G) and
2332b(g)(5) and Title 28, United States Code, Section 2461.)


FOREPERSON

PREET BHARARA
United States Attorney

-16-

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

- v. -

OUMAR ISSA,
HAROUNA TOURÉ, and
IDRISS ABDELRAHMAN,

**Defendants.**

### INDICTMENT

09 Cr.

(21 U.S.C. § 960a; 18 U.S.C. § 2339B.)

Preet Bharara
United States Attorney.

A TRUE BILL

Foreperson.

12/30/09 - Filed Indictment. Case
Assigned to Judge Holwell

# Exhibit C



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

August 20, 2010

**BY FAX**

Julia Gatto, Esq.
Federal Defenders of New York
52 Duane Street, 10th Floor
New York, NY 10007

Zachary Margulis-Ohnuma, Esq.
260 Madison Avenue, 18th Floor
New York, NY 10016

Michael Hurwitz, Esq.
299 Broadway, Suite 800
New York, NY 10007

Re:   United States v. Oumar Issa et al.,
      09 Cr. 1244 (RJH)

Counsel:

The Government writes in response to Mr. Margulis-Ohnuma's letter dated July 20, 2010, seeking additional discovery pursuant to Rule 16(a) of the Federal Rules of Criminal Procedure, as well as pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. To date, the Government is unaware of any *Brady* material regarding your clients, but will provide timely disclosure if any such material comes to light. The Government will provide material under *Giglio v. United States*, 405 U.S. 150, 154 (1972), and its progeny, in a timely manner prior to trial.

The requests in the letter are addressed herein in the order set forth in the letter. The first request, for a bill of particulars identifying the DEA confidential sources by name, date of birth, home address and phone number, is denied.

The second request, for copies of summary translations referenced in the drafting of the Complaint, is denied as premature. Such summary draft translations are discoverable, if at all, only as impeachment material for the Complaint affiant if and when said affiant testifies.

The third request seeks discovery of statements by Mohammad Touré to law enforcement agents. On March 10, 2010, Mohammad Touré was interviewed by, among others, a DEA Special

Agent from the Accra, Ghana, DEA Country Office. During the course of the interview, Touré said, in sum and substance, and among other things, the following:

1) He is a nephew of Harouna Touré, the defendant. Mohammad Touré has know Harouna, Idriss Abdelrahman, and Oumar Issa, who are all from the same area in Mali, called Manaca, for a number of years. According to Mohammad Touré, Harouna Touré works primarily as a transporter; Idriss Abdelrahman works primarily as a driver.

2) Mohammad Touré was present on December 7, 2009, the day of the arrests of the defendants, because Harouna Touré had invited him to participate in a meeting about the transportation of a load of "grain." He had spent the four previous days in a hotel in Ghana with the defendants, and during that time had gone to a garage to see the truck that the defendants had purchased with money given to them by "the Colombians."

3) Mohammad Touré denied any knowledge of past or present affiliation between the defendants and Al Qaeda.

The fourth request seeks documents or records indicating or suggesting that an individual other than defendant Idriss Abdelrahman was intended to drive the truck purchased by the defendants to transport the supposed load of narcotics to be provided by the FARC; the Government has searched for such evidence and is not aware of any. If, in the course of its continued search for discoverable materials, such information is obtained, it will be produced to you as soon as practicable.

The fifth request seeks any evidence tending to show that Abdelrahman "is not a member of Al-Qaeda." The Government has searched for such evidence and is not aware of any, with the exception of a statement, set forth below, by Mohammad Touré that he is not aware of any affiliation between any of the defendants and Al Qaeda. If, in the course of its continued search for discoverable materials, such information is obtained, it will be produced to you as soon as practicable.

The sixth request seeks "governmental document(s) purporting to describe the relation between Al Qaeda and the Tuareg in Mali and in the sub-Saharan region." The Government is not aware of any such document. Additionally, the request fails to articulate why and under what theory such a document would be discoverable.

Please contact us at your earliest convenience concerning the possible disposition of this matter or any further discovery which you may request.

Very truly yours,

PREET BHARARA
United States Attorney

By: _____
Jeffrey A. Brown/Christian R. Everdell
Assistant United States Attorneys
(212) 637-1110/2556

3

# Exhibit D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| - against - | 09 Cr. 1244 (RJH) |
| OUMAR ISSA, et al. | |
| Defendants. | |

## AFFIDAVIT OF IDRISSA ABDULRAHMAN SIDIBE IN SUPPORT OF DEFENDANT'S MOTION TO SUPPRESS

IDRISSA ABDULRAHMAN SIDIBE, being duly sworn, does hereby

swear and affirm that the following is true under penalties of perjury:

1.     My full name is Idrissa Abdulrahman Sidibe.  I am 35 years old.  I reside in the Gao region of Mali.  My native language is Songhai.

2.     I don't speak and I don't understand English.  As a result, this Affidavit has been orally translated for me from English into Songhai by Mr. Aly Haidara.  I have signed it only after reviewing it carefully in Songhai with Mr. Haidara.

3.     I am a defendant in the above-captioned case.  I submit this affidavit on the advice of my lawyer in support of a motion to suppress a statement I made after my arrest.  The following is based on my best recollection of the circumstances of my arrest.

4.     I came for the first time in the United States after having being arrested in Ghana in December 2009.

5.     On or about December 15, 2009 I was in a room at a hotel in Accra, Ghana with several other people: Harouna Touré, Mohammed Touré

i

and an Arab person I knew as Mohammed.  Armed officers entered the room and arrested us.

6.     I was placed in handcuffs with my hands behind my back.  I was taken downstairs.  I was then taken to an office where I was brought in front of a person sitting next to a Ghanaian flag.  I was handcuffed the entire time.

7.     In the office there were also a tall white man who was wearing a light blue shirt.  I later learned this was an official of the United States Government.  There was also a French translator.

8.     I do not speak or understand French very well.  I cannot understand legal concepts explained to me in French.  I can understand these concepts when they are explained in my language, which is Songhai.

9.     I asked the French translator if he would call my friend Baba Maiga.  Baba Maiga understands English and can speak Songhai.  He also has contacts in the Malian consulate in Ghana.  I had thought he worked for the consulate and I wanted the consulate to know I had been arrested.

10.     I did not understand what was happening in the room with the flag.  I tried to tell the person next to the flag that I didn't understand the languages they were using.  The person did not answer.

11.     The person sitting next to the flag started asking me questions.  I was not told at any time by that person (or by any one else) that I had the right to an attorney, that an attorney would be provided to me free of charge if necessary, that I had a right not to answer their questions, or that my answers to their questions could later be used against me.

12.     After that I was first brought into an office where I stayed for about three hours and then taken into a prison where I spend the night and most of the following day.  In the prison I was given food and water but it was very hot and I was bitten by mosquitoes.  It was also very crowded.

13.     In the early evening of the following day I was brought to an airplane.

ii

14.     In the car I asked a white man where I was being taken.  He said to New York.

15.     No one asked me if I agreed to be taken out of Ghana.

16.      In the plane and until my arrival in New York both my hands and ankles were restrained in chains.

17.     I did not sleep for approximately 36 hours.

18.     I had never been on a plane before.  In fact, I did not understand for a while that we were actually up in the air.

19.     Just as I was about to fall asleep on the plane, a white woman speaking French started questioning me.  Four men surrounded me listening.

20.     This questioning lasted for about one hour.

21.     I could not understand all that the lady speaking French was saying.

22.     When I could not understand what was being said, I would nod and smile.  I was very scared that if I disagreed with something that was said, I would be punished or killed.

23.     Sometimes when I did not understand, I would just say "oui" which is French for "yes."

24.     I did not understand anything that the woman or anyone else said to mean that I had the right to an attorney, that an attorney would be provided to me free of charge if necessary, that I had a right not to answer their questions, or that my answers to their questions could later be used against me.

25.     It is possible of course that they said these things but I could not understand them if they said them in French.

26.     I only found out that the white people who had taken me away were American government officials after I arrived in New York.

27.   The foregoing is true and correct to the best of my knowledge and recollection.

Dated:   New York, New York
         December *10* , 2010

_____
Idrissa Abdulrahman Sidibe

I do hereby swear and affirm that I faithfully read the foregoing Affidavit in the Songhai language to the Affiant and that he indicated to me in Songhai that he understood it.

_____
Aly Haidara

ZACHARY A. MARGULIS-OHNUMA
Notary Public, State of New York
No. 02MA6052101
Qualified in Putnam County
Commission Expires Dec. 11, 20*10*

iv

# Exhibit E

**U.S. Department of Justice**
Drug Enforcement Administration



## REPORT OF INVESTIGATION

Page 1 of 5

At: SOD/OSNT/960

7. ☐ Closed ☐ Requested Action Completed
☐ Action Requested By:

8. Date Prepared
12/22/2010

9. Other Officers:

10. Report Re: Post Arrest Statements of Idriss ABELRAHMAN on 12-17-2008



### SYNOPSIS

On December 17, 2009, Idriss ABELRAHMAN aka Idrissa ABDELRAHMAN made several post arrest statements to agents of the Drug Enforcement Administration, Special Operations Division, Narco-Terrorism Group. This Report of Investigation contains the summary of said statements.

### DETAILS

1. Reference is made to all other Reports of Investigation written under the above referenced file number and title. Specific reference is made to DEA-6, written by _____ _____, dated December 16, 2009 and entitled; "The Arrest of Harouna TOURE, Idrissa ABDELRAHMAN, Oumar ISSA, the Detention of Mohamed TOURE on December 16, 2009 and the Acquisition of N-24 and N-26 – N-30."



12. Signed (Agent)

13. Date
01-28-10

14. Approved (Name and Title)

15. Date
2-12-10

**DEA SENSITIVE**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

**U.S. Department of Justice**
Drug Enforcement Administration

| | 1. File No. | |
|---|---|---|
| **REPORT OF INVESTIGATION** *(Continuation)* | ▮▮▮▮ | ▮▮▮▮ |
| | ▮▮▮ ▮▮▮ ▮▮▮ | |

| 4.<br>Page  2  of  5 | |
|---|---|
| 5. Program Code | 6. Date Prepared<br>12/22/2010 |

2. On December 15, 2009, in the Southern District of New York, a federal arrest warrant (09 Mag 2719) was issued for Oumar ISSA, Harouna TOURE and Idriss ABELRAHMAN. The warrant charged ISSA, TOURE and ABELRAHMAN with Narco-Terrorism Conspiracy (Title 21 USC 960a) and Conspiracy to Provide Material Support and Resources to a Designated Foreign Terrorist Organization (Title 18 USC 2339B).

3. On December 16, 2009, the law enforcement authorities from the Accra, Ghana Narcotics Control Board (NCB) arrested ISSA, TOURE and ABELRAHMAN pursuant to said arrest warrants in Accra.

4. On December 17, 2009, NCB law enforcement officials transferred custody of the above-listed defendants to Agents of the Drug Enforcement Administration (DEA). On this same day, ISSA, TOURE and ABELRAHMAN were flown via chartered airlines to White Plains, New York, escorted by DEA Agents.

5. During the flight from Accra, Ghana to White Plains, New York, SA Bronwyn Haley, as witnessed by SA's Stouch and Lupacchino, verbally apprised ABELRAHMAM of his rights in French via DEA Form 13.  ABELRAHMAN informed Agents that he understood his rights and thereafter voluntarily and knowingly waived his rights and agreed to speak to agents. At this time, SA Stouch, through French translations conducted by SA Haley, explained the Southern District of New York charges of Narco-terrorism Conspiracy and Conspiracy to provide Material Support to a Designated Foreign Terrorist Organization to ABELRAHMAN.  ABELRAHMAN indicated that he understood said charges.  The following statements, in sum and substance, were made by ABELRAHMAN during his post arrest interview:

   a. ABELRAHMAN stated that he was in Ghana because TOURE asked ABELRAHMAN to go to there because they had business there and that there was "merchandise" in Ghana. ABELRAHMAN stated that he was under the impression that "merchandise" meant rice and oil because that is what TOURE told ABELRAHMAN. ABELRAHMAN stated that he learned the term "merchandise" referred to cocaine only after TOURE and ABELRAHMAN met with the "Fat Arab" named Mohammad ▮▮▮▮▮▮▮▮, hereinafter referred to as the CS, in Ghana. ABELRAHMAN stated that

DEA Form     - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

**1 - Prosecutor**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| **REPORT OF INVESTIGATION** | 1. File No. | ████████ |
|---|---|---|
| *(Continuation)* | | |

| 4.  Page  3  of  5 | |
|---|---|
| 5. Program Code | 6. Date Prepared  12/22/2010 |

is when TOURE told him that "merchandise" actually referred to cocaine. ABELRAHMAN related that when he realized the business proposal involved the transportation of cocaine ABELRAHMAN told TOURE to get someone else to help him conduct the transport.  ABELRAHMAN further stated he never saw the cocaine that was discussed and has never actually seen TOURE transport cocaine but knew that TOURE had transported narcotics in the past.

b. ABELRAHMAN stated that he recently met with TOURE, the CS#1 and a Colombian male ████████, hereinafter referred to as CS#2, in an Accra, Ghana hotel room wherein they discussed the transportation of the cocaine through Africa. ABELRAHMAN advised that during the meeting ABELRAHMAN witnessed CS#1 count currency and then observed CS#1 give said currency to TOURE.

c. ABELRAHMAN stated that during the meeting, CS#1 and CS#2 asked if ABELRAHMAN was AL QAEDA because ABELRAHMAN wore a turban. ABELRAHMAN stated he told CS#1 and CS#2 that he was not AL QAEDA.  ABELRAHMAN stated that before the meeting, TOURE instructed ABELRAHMAN to say he was AL QAEDA if CS#1 and CS#2 ask ABELRAHMAN so that they would be willing to pay for the transportation for the cocaine.

d. ABELRAHMAN stated that he (ABELRAHMAN) was not a General but that TOURE told him to say that during the meeting with CS#1 and CS#2.

e. ABELRAHMAN was not aware if TOURE was going to steal the merchandise (cocaine) from CS#1 and CS#2.

f. ABELRAHMAN did not know if TOURE ever worked with AL QAEDA. ABELRAHMAN stated TOURE has friends that are Toureg.

g. ABELRAHMAN has known TOURE for approximately 10 years. ABELRAHMAN knows TOURE to be a transporter of coal, wood and other building materials from Gao to Bamako.

h. ABELRAHMAN stated he owned a boutique in Mali and that he sold five cows in exchange for the boutique and that he is not involved in drug trafficking. ABELRAHMAN stated he owns several 4x4 vehicles.

**DEA SENSITIVE**
Drug Enforcement Administration

**1 - Prosecutor**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION<br>*(Continuation)* | 1. File No. ███ ███ |
|---|---|

4.
Page  4  of  5

| 5. Program Code | 6. Date Prepared<br>12/22/2010 |
|---|---|

i. ABELRAHMAN indicated that there are a lot of problems in northern
Mali and that in regards to transporting merchandise through that
region one must pay others to get through the region so that one's
merchandise is not stolen.

j. ABELRAHMAN stated that when he was in Ghana he stayed at the house
next to the Mali Embassy and that only single men could stay there.
ABELRAHMAN advised that TOURE stayed at a hotel in Accra named Des
Accra or Dez Accra. ABELRAHMAN further stated that TOURE's other
driver, Mohammad TOURE was previously in Benin to sell lambs for the
holy feast but that Mohammad TOURE came to Ghana to see Harouna TOURE
in order to purchase a truck.

k. ABELRAHMAN stated that CS#1 gave ABELRAHMAN a satellite phone so
ABELRAHMAN could use when ABELRAHMAN and TOURE began transporting the
cocaine for CS#1 and CS#2.  When asked by the agents the whereabouts
of the satellite phones, ABELRAHMAN replied that TOURE subsequently
took possession of all four phones that CS#1 gave them and further
stated that TOURE kept one phone for himself but ABELRAHMAN did not
know the whereabouts of the other three satellite phones.

l. ABELRAHMAN stated the truck that was to be used to transport the
cocaine was stored in a garage in Accra, Ghana.  ABELRAHMAN stated
the truck was purchased for 13,700 cefas.  ABELRAHMAN stated that a
tall Malian chauffeur was supposed to drive the truck.

m. ABELRAHMAN stated that he would be killed if he cooperated with
the DEA and then asked if it would be possible if the agents could
bring his family from Gao to Bamako so that they would be safe.

n. ABELRAHMAN stated that the American military is in Gao looking for
Salafists and AL QAEDA members. ABELRAHMAN stated he knew the region
well and then stated that AL QAEDA does not like to work with blacks
and only liked to work with white Arabs.

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

**1 - Prosecutor**

**U.S. Department of Justice**
Drug Enforcement Administration

## REPORT OF INVESTIGATION

█████

1  ████ ████    ███ ██

███ ███ ████

█ ██ █ █

███ ██

██ ██ ██

██ █ ██    ██

██ ██ ██

██ ██     ██    ███ █ ██

██ ██

██ █ ██

**1 - Prosecutor**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.