UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

- AGAINST -

OUMAR ISSA, HAROUNA TOURÉ AND
IDRISS ABDELRAHMAN,

DEFENDANTS.

09 Cr. 1244 (RJH)

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
IDRISS ABDELRAHMAN'S PRE-TRIAL MOTIONS**

Law Office of Zachary Margulis-Ohnuma
260 Madison Avenue, 18th Fl.
New York, NY
(212) 685-0999
info@zmolaw.com

*Attorney for Defendant Idriss Abdelrahman*

# TABLE OF CONTENTS

FACTS ........................................................................................................... 2

    A.  The Complaint and Indictment Allege a Conspiracy Unrelated to the United States ........................................................................... 2

    B.  Three of the Four Arrestees are Rendered to the United States without Judicial Process in Ghana .................................................. 4

    C.  Mr. Abdelrahman Allegedly Gives a Statement to U.S. Law Enforcement En Route to the United States .................................... 5

ARGUMENT ................................................................................................ 6

   I.  THE INDICTMENT MUST BE DISMISSED BECAUSE IT FAILS TO DESCRIBE ANY CONDUCT THAT CONGRESS INTENDED TO BE A CRIME UNDER THE JURISDICTION OF THE LAWS OF THE UNITED STATES ................................................................... 7

    A.  Background on the Offenses Charged: The Jurisdictional Provisions of the Narco-Terrorism and Material Support Statutes . 8

    B.  In General, American Penal Statutes Do Not Proscribe Extraterritorial Conduct that is not at Least Intended to Have an Effect in the United States ............................................................. 15

    C.  The Government Can Only Arguably Rely on Mr. Abdelrahman's Presence Before the Court as a Jurisdictional Basis under Either Statute ........................................................................................... 17

    D.  The Defendant's Presence in the United States Does not Provide Jurisdiction Under These Circumstances ...................................... 21

  II.  THE INDICTMENT MUST BE DISMISSED BECAUSE ITS APPLICATION HERE EXCEEDS CONGRESS' LEGISLATIVE AUTHORITY ...................................................................................... 31

    A.  The Commerce Clause Does Not Confer Jurisdiction in this Case Because the Government Does Not and Cannot Allege Any Conceivable Effect on Interstate or Foreign Commerce ............... 33

    B.  The Authority to Punish Violations of the Law of Nations Does Not Apply Because Narco-Terrorism and Material Support Are Not Violations of the Law of Nations ........................................... 36

    C.  No Treaty Obligation Requires Congress to Punish Narco-Terrorism or Material Support ....................................................... 37

III. THE INDICTMENT MUST BE DISMISSED BECAUSE
APPLICATION TO THESE FACTS WOULD VIOLATE MR.
ABDELRAHMAN'S DUE PROCESS RIGHTS UNDER THE
UNITED STATES CONSTITUTION ................................................ 37

    A. Governing Legal Standard: The Government Must Allege a
Sufficient Nexus to the United States so that the Application of
U.S. Law is Not Arbitrary or Unfair .............................................. 38

    B. Application: There was No Nexus and So the Indictment Must be
Dismissed ...................................................................................... 40

IV. MR. ABDELRAHMAN'S STATEMENT ON THE PLANE
SHOULD BE SUPPRESSED BECAUSE IT WAS OBTAINED IN
VIOLATION OF THE UNITED STATES CONSTITUTION .......... 42

V. THE COURT SHOULD COMPEL THE GOVERNMENT TO
ASSIST THE DEFENSE IN BRINGING MATERIAL WITNESSES
MUHAMMAD TOURÉ AND YACOUBA ABDELRAHMAN TO
TESTIFY AT TRIAL OR IN DEPOSITIONS ................................... 42

    A. The Need for the Witnesses' Testimony is Set Forth *Ex Parte*
Pursuant to Rule 17(b) ................................................................... 43

    B. The Court has Authority to Issue Subpoenas and Order the
Payment of Travel Expense of a Non-Resident Alien Living
Abroad ........................................................................................... 44

    C. In the Alternative, the Defendant Requests an Order for a
Deposition ...................................................................................... 48

CONCLUSION ............................................................................................. 52

# TABLE OF AUTHORITIES

## Cases

*Chickasaw Nation v. U.S.*, 534 U.S. 84 (2001) ............................................ 29

*Cook v. U.S.*, 288 U.S. 102 (1933) ............................................................ 16

*Edgington v. U.S.*, 164 U.S. 361 (1896) .................................................... 44

*Gibbons v. Ogden*, 22 U.S. 1 (1824) ......................................................... 36

*In re Grand Jury Proceedings U.S. v. Field*, 532 F.2d 404 (1976) .............. 45

*Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111 (2d Cir.
    Sept. 17, 2010) ....................................................................................... 25

*McCulloch v. Sociedad Nacional de Marineros de Honduras*,
    372 U.S. 10 (1963) ........................................................................... 15, 27

*Miranda v. Arizona*, 384 U.S. 436 (1966) .................................................. 42

*Murray v. The Charming Betsy*, 6 U.S. (2 Cranch) 64,
    2 L.Ed. 208 (1804) ................................................................................. 16

*U.S. v. Al Kassar*, 582 F.Supp.2d 488 (S.D.N.Y. 2008) .............................. 40

*U.S. v. Barker*, 553 F.2d 1013 (6th Cir. 1977) ........................................... 46

*U.S. v. Bennett*, 539 F.2d 45 (10th Cir. 1976) ........................................... 46

*U.S. v. Bin Laden*, 92 F.Supp.2d 189 (S.D.N.Y. 2000) ............................... 16

*U.S. v. Cohen*, 250 F.3d 68 (2d Cir. 2001) ................................................. 48

*U.S. v. Davis*, 905 F.2d 245 (9th Cir. 1990) ........................................ 38, 40

*U.S. v. De La Rosa*, 911 F.2d 985 (5th Cir. 1990) ...................................... 18

*U.S. v. Dragoul*, 1 F.3d 1547 (11th Cir. 1993) ........................................... 49

*U.S. v. Florack*, 838 F.Supp. 77 (W.D.N.Y. 1993) ..................................... 46

*U.S. v. Germann*, 370 F.3d 1019 (2d Cir. 1967) ........................................ 45

*U.S. v. Greschner*, 802 F.2d 373 (10th Cir. 1986) ..................................... 43

*U.S. v. Huang*, 827 F.Supp. 945 (S.D.N.Y. 1993) ...................................... 47

*U.S. v. Kahn*, 35 F.3d 426 (9th Cir. 1994) ................................................. 40

*U.S. v. Klimavicius-Viloria*, 144 F.3d 1249 (9th Cir. 1998) .................... 39-40

*U.S. v. Largan*, 330 F.Supp. 296 (S.D.N.Y. 1971) .................................. 44-47

*U.S. v. Lopez*, 514 U.S. 549, 552 (1995) ........................................... *passim*

*U.S. v. Mathurin*, 148 F.3d 68 (2d Cir. 1998) ............................................ 42

*U.S. v. Meriwether,* 486 F.2d 498 (5th Cir. 1973), *cert. denied,*
　　417 U.S. 948 (1974) ..............................................................43-44

*U.S. v. Moore*, 917 F.2d 215 (6th Cir. 1990) ...............................46

*U.S. v. Palestine Liberation Org.*, 695 F.Supp. 1456
　　(S.D.N.Y.1988) ...............................................................16

*U.S. v. Paredes*, 950 F.2d 584 (S.D.N.Y. 1996)...........................22

*U.S. v. Ratzlaf*, 510 U.S. 135 (1994)........................................29

*U.S. v. Sanchez-Lima*, 161 F.3d 545 (9th Cir. 1998) ...................49

*U.S. v. Scott*, 223 F.3d 208 (3d Cir. 2000)..................................43

*U.S. v. Sims*, 637 F.2d 625 (9th Cir. 1980) .................................46

*U.S. v. Sindona*, 636 F.2d 792 (2d Cir. 1980)..............................50

*U.S. v. Yousef*, 327 F.3d 56 (2d Cir. 2003) ........................*passim*

*U.S. v. Yousef*, S3 08 Cr. 1213 (JFK), 2010 WL 3377499
　　(S.D.N.Y. Aug. 23, 2010)....................................................38

*U.S. v. Yunis*, 924 F.2d 1086 (D.C.Cir. 1991) .......................15-16

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286
　　(1980) ...........................................................................39

## Constitutional Provisions

U.S. Const. Art. I, § 8, cl. 3 ...................................................34

U.S. Const. Art. I, § 8 cl. 10 ..................................................36

## Federal Statutes

18 U.S.C. § 10...................................................................18

18 U.S.C. § 2339A..........................................................12, 21

18 U.S.C. § 2339B.......................................................*passim*

18 U.S.C. § 3181...............................................................29

21 U.S.C. § 841................................................................18

21 U.S.C. § 960a.........................................................*passim*

47 Stat. 2122 ..............................................................29, 30

Fed.R.Crim.P. 15(a)(1) ........................................................48

Fed.R.Crim.P. 15(f) ...........................................................49

Fed.R.Crim.P. 17(b)......................................................42-43, 46

Fed.R.Evid. 804 ...............................................................49

Pub. L. 104-132 ................................................................... 11, 33
Pub. L. 107-56 § 810 .................................................................. 12
Pub. L. 108-458 § 6603 .......................................................12-14
Pub. L. 109-177 ...................................................................... 8, 12

### Other Authorities

Biran T. Yeh & Charles Doyle, *USA PATRIOT Improvement and
    Reauthorization Act of 2005 (H.R. 3199): A Legal Analysis
    of the Conference Bill* (Cong. Research Serv. January 17, 2006),
    *available at*, http://www.fas.org/sgp/crs/intel/RL33239.pdf .............10

Charles Doyle, *Terrorist Material Support: An Overview of 18 U.S.C.
    2339A and 2339B* (Cong. Research Serv. July 19, 2010),
    *available at* http://www.fas.org/sgp/crs/natsec/R41333.pdf .............14

H.R. Rep. 109-174(1) .......................................................... 11, 32

List of Signatories to Convention on the Taking of Evidence Abroad,
    *available at*, http://www.hcch.net/upload/overview20e.pdf .............51

Defendant Idriss Abdelrahman, a Songhai tribesman who never set foot outside of Africa before being rendered to New York on a jet chartered by the U.S. Drug Enforcement Administration ("DEA"), is accused of conspiring to (1) smuggle narcotics in connection with two terrorist organizations and (2) provide material support to those organizations. The basis of the allegations is nothing more than Mr. Abdelrahman's presence at a series of meetings in Ghana instigated, organized, led and paid for by a DEA informant known only as "CS-1." There is no allegation in this case of any actual activity by any real terrorist organization. The allegations of involvement by Al Qaeda and the Fuerza Armada Revolucionarias de Colombia ("FARC") are based on the defendants' assent to words uttered by the DEA informants.

At the meetings, the parties discussed only conduct outside of the United States that could not possibly have any effect, intended or incidental, inside the United States: the smuggling of drugs arriving in Ghana from Colombia and proceeding through Africa to Spain. Nonetheless, on this basis, the DEA and Ghanaian authorities obtained U.S. federal warrants, arrested the defendants, flew them to the United States, and required them to give statements while en route. As discussed below, this sting operation stretches the express extraterritorial jurisdiction of the statutes beyond the

1

breaking point.  Argument § I, *infra*.  Moreover, application of the statutes in

this manner is not authorized by any power granted to Congress under the

Constitution.  Argument § II, *infra.* Even if the statutes were validly in force

overseas, their application on these facts would violate the Fifth Amendment

Due Process Clause as there is no sufficient nexus between Mr.

Abdelrahman and the United States.  Argument § III, *infra*.  For these three

reasons, the Indictment fails to allege a crime punishable under U.S. law

and, we respectfully submit, must be dismissed before trial.

Moreover, the custodial statement Mr. Abdelrahman gave on the

plane was in violation of his *Miranda* rights and should be suppressed.

Argument § IV, *infra*.  Finally, we request the Court's assistance in securing

the testimony of crucial defense witnesses Muhammed Touré and Yacouba

Abdelrahman.  Argument § V, *infra*.

## FACTS

### A.     The Complaint and Indictment Allege a Conspiracy Unrelated to the United States

This section sets forth the facts alleged in the Sealed Complaint

executed by DEA Special Agent Daria Lupacchino on December 15, 2009

and the Indictment filed two weeks later on December 30.  *See* Affirmation

of Zachary Margulis-Ohnuma Ex. A (Sealed Complaint) and Ex. B

(Indictment).[1]  Nothing in this section should be construed as any sort of admission by Mr. Abdelrahman.[2]

The Complaint and Indictment filed in this case allege that Mr. Abdelrahman and his co-defendants attended a series of meetings with CS-1, who posed as a go-between for Colombian drug traffickers, and another man identified as "CS-2," who spoke Spanish and posed as a representative of FARC, a Colombian group.  CS-1 and CS-2 claimed they were interested in transporting cocaine from Ghana, across the Sahara Desert and onward to Spain.  They offered the defendants large sums of money to arrange for the transportation and protection across the desert.  According to the Complaint and Indictment, CS-1 and CS-2 disclosed they were affiliated with FARC and the defendants suggested they were associated with Al Qaeda.

There was no discussion of any act of violence or terrorism.  There was no discussion of any attack on U.S. soil or U.S. interests.  There was no discussion of transporting drugs to or from the United States.  There was no discussion of using U.S. banks or other businesses to achieve the objectives

---

[1] Hereinafter, references to Exhibits are exhibits to this Affirmation, which is attached to the Notice of Motion filed with this brief.

[2] As will become abundantly clear at trial, video and audio recordings that have been turned over by the government contradict many of the cooperating witnesses' claims in the Complaint.  Nonetheless, for purposes of argument on these motions, we accept as true the allegations in the Complaint.

of the conspiracy. There was no discussion of using U.S.-made or supplied equipment to achieve the ends of the conspiracy. Most importantly, there was no discussion that any assistance to Al Qaeda or FARC would be used in any way to affect U.S. interests. In short, there was no connection – intended or actual – with the United States *except* the fact that the plot was hatched by agents in the pay of the United States government.

**B.** **Three of the Four Arrestees are Rendered to the United States without Judicial Process in Ghana**

On the basis of CS-1's allegations about the meetings, the DEA obtained warrants from the Southern District of New York on December 15, 2009, authorizing the arrest, under U.S. law, of Omar Issa, Harouna Touré, and Idriss Abdelrahman. The next day, agents of the United States government and the Ghanaian government took the three defendants and a fourth individual, Muhammad Touré, into custody at a hotel room in Accra, Ghana Muhammad Touré was held and eventually released but apparently remains under the supervision of Ghanaian authorities. Mr. Touré later told the government that, although he knew the defendants for years, had just spent four days with them in Ghana, and attended the meeting with CS-1 when they were arrested, he had no knowledge of any affiliation between them and Al Qaeda. *See* Ex. C (government letter describing Muhammad Touré's statement).

The three defendants were brought before some sort of Ghanaian official and remanded to a prison with horrific conditions. *See generally* Ex. D (Affidavit of Idriss Abdelrahman). The next evening, after nearly 36 hours in custody, they were placed in shackles and driven to a chartered plane to New York. No documents have been provided in discovery documenting the legal basis for their involuntary removal from Ghana.

Once in the United States, they were brought to the Southern District of New York, where the instant proceeding was commenced. No consular notification was made prior to their removal from Ghana and efforts by Malian consular authorities to obtain information on their whereabouts and well-being were unsuccessful.

**C.  Mr. Abdelrahman Allegedly Gives a Statement to U.S. Law Enforcement En Route to the United States**

On the way to the United States, all three defendants allegedly made statements in French. Although he speaks a few words of French and Arabic in addition to Songhai, Mr. Abdelrahman was not read his *Miranda* rights, at least in any language he was able to understand. The government claims that Mr. Abdelrahman told the government that he only found out that the "merchandise" discussed by Mr. Touré and the informants was illegal drugs after the meeting with CS-1. *See* Ex. E (DEA-6 describing Abdelrahman's custodial statement). At that point, Mr. Abdelrahman asked Mr. Touré to

get someone else to help him transport the drugs. *Id.* at 3. In the statement, Mr. Abdelrahman denied working with Al Qaeda and made no mention of FARC.

## ARGUMENT

The application of the narco-terrorism statute, 21 U.S.C. § 960a, and the material support statute, 18 U.S.C. § 2339B, to these facts raises important jurisdictional and constitutional questions: first, did Congress *intend* to reach the conduct complained of here, *viz.* participation in a conspiracy with no connection whatsoever to the United States *except* that it was instigated by U.S. agents? Second, if Congress did intend such statutory jurisdiction for each of the counts, is such jurisdiction a valid exercise of Congress' power under the Commerce Clause or some other Constitutional grant of authority? And finally, if Congress intended to use power validly vested in it to penalize the conduct at issue here, does the Due Process Clause permit such an exercise of power where there was no connection between the defendants or their alleged conduct and the United States? It is respectfully submitted, based on a careful reading of the wording and history of both statutes, that Congress could not possibly have intended them to apply in these circumstances and that such an application would not only

exceed any affirmative grant of power to Congress but it would also violate the due process rights of the defendants. *See* Argument I-III, *infra.*

In the event the Indictment is not dismissed, we ask the Court to suppress Mr. Abdelrahman's custodial statement because he was never read his *Miranda* rights in any language he could understand. *See* Argument IV, *infra.* Finally, if the case goes to trial, we request the Court's assistance, pursuant to the Compulsory Process and Due Process Clauses of the United States Constitution, in obtaining the presence at trial or preserving the testimony of key defense witnesses. *See* Argument V, *infra.*

I.   **The Indictment Must be Dismissed Because It Fails to Describe Any Conduct that Congress Intended to Be a Crime under the Jurisdiction of the Laws of the United States**

With respect to the jurisdiction of this Court, we argue in this section that the language, structure and legislative histories of the statutes under which Mr. Abdelrahman is charged indicate that Congress never intended them to reach conduct wholly unrelated to the United States other than the fact that it was instigated by agents of the United States government who illegally brought him here. To accomplish this, we review the two statutes and the presumptions employed by courts analyzing the extraterritorial reach of U.S. statutes. In the following sections, Argument § II-III, *infra*, we argue in the alternative that even if the statutes as written did reach the

conduct alleged, their application under these circumstances would exceed

any power granted to Congress under the Constitution and, in any event,

violate the Due Process Clause under Second Circuit caselaw because there

is an insufficient nexus to the United States.

A. **Background on the Offenses Charged: The Jurisdictional Provisions of the Narco-Terrorism and Material Support Statutes**

The Complaint and Indictment charge Mr. Abdelrahman with

violating two statutes, 21 U.S.C. § 960a, the "narco-terrorism" statute and 18

U.S.C. § 2339B, the "material support" of terrorism statute. Both are

charged *only* as conspiracies, not as completed acts. We analyze them in

turn.

1. **The Narco-Terrorism Statute**

Section 960a was added to the criminal code as part of the USA

PATRIOT Improvement and Reauthorization Act of 2005 which was signed

into law on March 9, 2006. *See* Pub. L. 109-177, Title I, § 122, 120 Stat.

225. The statute penalizes conspiring to traffic in illegal drugs "knowing or

intending to provide, directly or indirectly, anything of pecuniary value to

any person or organization" engaged in terrorism or terrorist activity. 21

U.S.C. § 960a(a). It specifically requires proof that the defendant "has

knowledge that the person or organization has engaged or engages in terrorist activity[.]" 21 U.S.C. § 960a(c).

The statute also contains a detailed jurisdictional provision. It reads as follows:

> (b) **Jurisdiction**. There is jurisdiction over an offense under this section if--
>
>> (1) the prohibited drug activity or the terrorist offense is in violation of the criminal laws of the United States;
>>
>> (2) the offense, the prohibited drug activity, or the terrorist offense occurs in or affects interstate or foreign commerce;
>>
>> (3) an offender provides anything of pecuniary value for a terrorist offense that causes or is designed to cause death or serious bodily injury to a national of the United States while that national is outside the United States, or substantial damage to the property of a legal entity organized under the laws of the United States (including any of its States, districts, commonwealths, territories, or possessions) while that property is outside of the United States;
>>
>> (4) the offense or the prohibited drug activity occurs in whole or in part outside of the United States (including on the high seas), and a perpetrator of the offense or the prohibited drug activity is a national of the United States or a legal entity organized under the laws of the United States (including any of its States, districts, commonwealths, territories, or possessions); or
>>
>> (5) after the conduct required for the offense occurs an offender is brought into or found in the United States, even if the conduct required for the offense occurs outside the United States.

21 U.S.C. § 960a(b).[3]

Even before it was enacted, the apparent breadth of this jurisdictional language raised concerns in Congress. According to a footnote in a report by the Congressional Research Service published on January 17, 2006: "In cases where neither the support, the drug offense, nor the terrorism have any connection to the U.S. other than the later presence[] of the offender here, paragraph 960a(b)(5) may exceed Congress' legislative reach unless the benefit of a treaty obligation can be claimed." Brian T. Yeh & Charles Doyle, *USA PATRIOT Improvement and Reauthorization Act of 2005 (H.R. 3199): A Legal Analysis of the Conference Bill* at 21, f.n. 95 (Cong. Research Serv. Jan. 17, 2006), *available at* http://www.fas.org/sgp/crs/ intel/RL33239.pdf.

It appears that the House of Representatives specifically considered this concern in crafting the jurisdictional language that ultimately passed. In its report on the bill, the House Judiciary Committee noted that the Constitution "limits the manner in manner in which [extraterritorial jurisdiction] may be exercised. The due process clause of the Fifth

---

[3] For a comparison of these jurisdictional provisions, the jurisdictional provisions in the material support statute, and the jurisdiction of a state to punish crimes outside its territory under international law, please see the chart on page 24, *infra*.

Amendment, for instance, bars the extraterritorial application of Federal criminal laws in the absence of a connection between the crime, the defendant, and the United States. Prosecution requires personal jurisdiction over the defendant and subject matter jurisdiction over the crime." House Report 109-174(1) at 41. Presumably, the narco-terrorism provision was drafted and passed with the Constitutional limitations – as Congress understood them – in mind.

### 2. The Material Support Statute

The statute criminalizing "material support" for terrorist organizations, 18 U.S.C. § 2339B, is older with a more developed caselaw. It was originally passed as part of the Anti-Terrorism and Effective Death Penalty Act of 1996. Pub. L. 104-132. Section 2339B prohibits conspiring to "provide material support or resources to a foreign terrorist organization[.]" As originally enacted, it contained two specific and apparently contradictory jurisdictional provisions:

- the criminal prohibition applied only to a person who knowingly provides material support to a terrorist organization "within the United States or subject to the jurisdiction of the United States," *see* Pub. L. 104-132, § 303(a), *codified as* 18 U.S.C. §2339B(d) (1996 ed.) and

- "[t]here is extraterritorial Federal jurisdiction over an offense under this section." *See* Pub. L. 104-132, § 303(a), *codified as* 18 U.S.C. §2339B(d) (1996 ed.).

The statute provided for a criminal penalty of up to ten years imprisonment. 18 U.S.C. § 2339A(a) (1996 ed.). This statutory maximum was increased to 15 years in Title VIII of the first USA PATRIOT Act of 2001. Pub. L. 107-56 § 810.

Congress rewrote the jurisdictional provisions in the Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. 108-458 § 6603. These amendments were made permanent two years later in the second USA PATRIOT Act, formally known as the USA PATRIOT Improvement and Reauthorization Act and Terrorism Prevention Reauthorization Act, Pub. L. 109-177. First, the amendments struck the language limiting the prohibition to conduct "within the United States or subject to the jurisdiction of the United States." *See* Pub. L. 108-458 § 6603(c)(1). Next, the amendments *added* a list of jurisdictional bases for prosecution in 18 U.S.C. § 2339B(d). The amendments specified that, in addition to the old and general "extraterritorial jurisdiction," there is jurisdiction to prosecute prohibited conduct in the following circumstances:

> (A) an offender is a national of the United States …;
>
> (B) an offender is a stateless person whose habitual residence is in the United States;
>
> (C) after the conduct required for the offense occurs an offender is brought into or found in the United States, even if the

conduct required for the offense occurs outside the United States;

(D) the offense occurs in whole or in part within the United States;

(E) the offense occurs in or affects interstate or foreign commerce; or

(F) an offender aids or abets any person over whom jurisdiction exists under this paragraph in committing an offense under subsection (a) or conspires with any person over whom jurisdiction exists under this paragraph to commit an offense under subsection (a).

Pub. L. 108-458 § 6603(d)(1).[4]

The amendments also included two provisions that tend to limit the statute's scope and protect relatively blameless defendants. First, Congress added a precise *scienter* requirement adding the following language: "To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization … or that the organization has engaged or engages in terrorism []." Pub. L. 108-458 § 6603(c)(2). Second, Congress specified that it did not intend to create a conflict with the First Amendment, adding a "Rule of Construction" to the effect that "Nothing in this section shall be construed or applied so as to abridge the exercise of

---

[4] For a comparison of these jurisdictional provisions with those found in the narco-terrorism statute, 21 U.S.C. § 960a, and the jurisdiction of a state to punish crimes outside its territory under international law, please see the chart on page 24, *infra*.

rights guaranteed under the First Amendment to the Constitution of the United States."  Pub. L. 108-458 § 6603(f), *codified at* 18 U.S.C. 2339B(i).[5]

In short, the two offenses charged here are based on two relatively new and untested statutes asserting criminal jurisdiction for certain conduct in foreign countries.  The jurisdictional clauses invoked are different from each other and, presumably, the product of careful study and amendment by Congress over a period of about ten years since the original enactment of the material support provision.  The extraordinary circumstances of the instant prosecution call into question the precise meaning of these jurisdictional clauses.  As discussed below, in light of the legal background against which they were enacted, the clauses do not provide jurisdiction over the conspiracy alleged in this case.

_____

[5] The anomaly of the specific jurisdictional provisions added against the background of the general extraterritorial jurisdiction and customary international law was noted by the Congressional Research Service in a report that appeared this summer: "The legislative history of the 2004 act provides no explanation of why the apparently overlapping descriptive statement [i.e. 18 U.S.C. § 2339B(d)(1)] was thought necessary." Charles Doyle, *Terrorist Material Support: An Overview of 18 U.S.C. 2339A and 2339B* at 14 (Cong. Research Serv. July 19, 2010), *available at* http://www.fas.org/sgp/crs/natsec/R41333.pdf.  In the CRS's view, the "general declaration of overseas application relies on the principles of international law under which a claim of extraterritorial jurisdiction might be recognized." *Id*. at 13.  Therefore, in this view, the general statement in 18 U.S.C. § 2339B(d)(2) merely adopts the extent of jurisdiction permitted under international law.

**B. In General, American Penal Statutes Do Not Proscribe Extraterritorial Conduct that is not at Least Intended to Have an Effect in the United States**

The term "extraterritorial jurisdiction" refers to subject matter jurisdiction of a United States court to adjudicate conduct committed outside the United States. *See U.S. v. Yousef*, 327 F.3d 56, 85 f.n. 16 (2d Cir. 2003) ("By 'extraterritorial jurisdiction' we mean subject matter jurisdiction of a United States court to adjudicate conduct committed outside of the United States."). We do not dispute that Congress may assert extraterritorial criminal jurisdiction – i.e. grant jurisdiction to the United States courts to punish conduct overseas – so long as such jurisdiction is based on a valid Congressional power and does not violate the Due Process Clause of the Fifth Amendment or some other provision of the Constitution. *Id.* at 86.

However, Courts scrutinize carefully whether an enactment is intended to reach extraterritorial conduct. In particular, the Second Circuit has instructed that "[i]n determining whether Congress intended a federal statute to apply to overseas conduct, 'an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains.'" *Id.*, *quoting McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 21 (1963). As Judge Sand has explained:

> It is well-established that Congress has the power to override international law. *See U.S. v. Yunis*, 924 F.2d 1086, 1091

15

(D.C.Cir.1991); Restatement [of Foreign Relations] § 402, cmt. i.  Courts are to presume, however, that Congress generally intends its statutes to be consistent with international law.  *See Murray v. The Charming Betsy*, 6 U.S. (2 Cranch) 64, 117-18, 2 L.Ed. 208 (1804) (stating that "an Act of Congress ought never to be construed to violate the law of nations if any other possible construction remains").  This presumption can be overcome only by a clear statement of intent to override international law.  *See Cook v. U.S.*, 288 U.S. 102, 119-20 (1933) (stating that "[a] treaty will not be deemed to have been abrogated or modified by a later statute, unless such a purpose on the part of Congress has been clearly expressed"); *U.S. v. Palestine Liberation Org.*, 695 F.Supp. 1456, 1465, 1468 (S.D.N.Y.1988) (same).

*U.S. v. Bin Laden*, 92 F.Supp.2d 189, 214 (S.D.N.Y. 2000).  Both the

narco-terrorism and material support statutes, of course, contain provisions

for extraterritorial application under *some* circumstances.  Neither contains

any "statement of intent to override international law" – let alone any *clear*

statement of such intent.  Moreover, the jurisdictional circumstances set

forth in the statutes are both limited and complex, with the statutes setting

forth 11 separate, varying bases of jurisdiction for the offenses – five for

narco-terrorism and six for material support.   In the case of the material

support statute, Congress chose to *add* the list of circumstances to the statute

nearly ten years after the law was originally passed.  These detailed

jurisdictional provisions clearly contradict any assertion that Congress

intended the United States courts to have jurisdiction over *every* narco-terror

or material support conspiracy under *every* circumstance in *every* location all

over the world – if that's what Congress meant, that's what Congress would have said.  Rather, jurisdiction attaches when the specified jurisdictional circumstances are present, consistent with international law.

### C. The Government Can Only Arguably Rely on Mr. Abdelrahman's Presence Before the Court as a Jurisdictional Basis under Either Statute

We can quickly dispense with four of the five jurisdictional circumstances for each of the statutes: the government's only colorable argument that the Court has jurisdiction is the fact that Mr. Abdelrahman is physically before the court.[6]  As described in Argument I.D, *infra*, that fact does not confer jurisdiction either.

### 1. Only 21 U.S.C. § 960a(b)(5) Even Arguably Provides Jurisdiction under the Narco-Terrorism Statute

As noted above, the narco-terrorism statute provides five circumstances under which extraterritorial jurisdiction apples.  *See* 21 U.S.C. § 960a(b).  It is respectfully submitted that the first four are not even arguably applicable here.

*First*, subsection one applies when the activity is in violation of the criminal laws of the United States.  21 U.S.C. § 960a(b)(1).  In this case, Mr. Abdelrahman was not charged with any domestic drug-trafficking and no

---

[6] To the extent the government relies on other circumstances for jurisdiction, we will address those in greater detail in reply.

other criminal law was violated because the proposed transaction involved solely drugs coming from South America through Africa to Europe. Thus subsection (1) provides no basis for jurisdiction. The government appears to concede this point not only by its charging decision, but also by the Indictment's contrary-to-fact reference to conduct that "*would be* punishable under Title 21, United States Code Section 841(a) *if* committed within the jurisdiction of the United States[.]" Ind. ¶ 9 (emphasis added). If the government proffers a particular "criminal law[] of the United States" that it alleges has been violated, we will address that on reply.

*Second*, subsection two applies only when the government can allege or demonstrate the conduct "occur[red] in or affect[ed] interstate or foreign commerce." 21 U.S.C. § 960a(b)(2). Although the Indictment tracks this language, Ind. ¶ 8, nothing in the Complaint or Indictment supports in any way the notion that the conspiracy alleged occurred in or affected interstate commerce. There is nothing in the charging documents or the discovery disclosed to date to even suggest an actual or intended effect on interstate or foreign commerce. Of course, "foreign commerce" refers to commerce between the United States and other nations. 18 U.S.C. § 10 (defining "foreign commerce"); *U.S. v. De La Rosa*, 911 F.2d 985, 989 (5th Cir. 1990) ("'Foreign Commerce' means to or from the United States."). Here, the

government can demonstrate no conceivable effect on any commerce with the United States, since the phony drugs were proposed only to be transported from Colombia, through Africa for sale and consumption in Spain.

*Third*, subsection three provides jurisdiction where the offender provides something of value for a terrorist act that causes death, injury or property damage to a U.S. national. 21 U.S.C. § 960a(b)(3). There is no such allegation in this case.

*Fourth*, subsection four provides jurisdiction only over U.S. nationals and corporate entities. 21 U.S.C. § 960a(b)(4). It is undisputed that Mr. Abdelrahman is not a national of the United States.

*Fifth*, subsection five provides jurisdiction over extraterritorial conduct, after the conduct constituting the offense occurs, when the defendant "is brought into or found in the United States[.]" 21 U.S.C. § 960a(b)(5). The government is likely to rely principally on subsection five in this case for jurisdiction to prosecute under the narco-terrorism statute. However, as explained below, such reliance is misplaced as the statute does not create jurisdiction where the offender is *illegally* brought to the United States and where, as here, the assertion of such jurisdiction would violate international law.

### 2. Only 18 U.S.C. § 2339B(d)(1)(C) Even Arguably Provides Jurisdiction under the Material Support Statute

The material support statute provides six different circumstances under which jurisdiction is available in American courts to prosecute material support abroad. 18 U.S.C. § 2339B(d)(1). In addition, unlike the narco-terrorism statute, the material support statute asserts generally that "there is extraterritorial Federal jurisdiction over an offense under this section." 18 U.S.C. § 2339B(d)(2). As with the narco-terrorism statute, only one of these jurisdictional provisions – where the defendant is brought into or found in the United States – even arguably applies here. We briefly address the jurisdictional circumstances listed in subsection (d) here.

*First and second*, the statute applies to extraterritorial conduct by a person who is a U.S. national, a lawful permanent resident, or a stateless person living here. 18 U.S.C. § 2339B(d)(1)(A) – (B). It is likely to be undisputed that Mr. Abdelrahman falls into none of these categories.

*Third*, there is jurisdiction when "after the conduct required for the offense occurs an offender is brought into or found in the United States even if the conduct required for the offense occurs outside the United States." 18 U.S.C. 2339B(d)(1)(C). As discussed in further detail below, this provision cannot be read to suggest that jurisdiction is valid where the defendant is

unlawfully brought to the United States solely to manufacture jurisdiction under the statute.

*Fourth*, jurisdiction is available when an offense occurs at least in part in the United States. 18 U.S.C. § 2339B(d)(1)(D). There has never been any allegation in this case of any conduct in the United States whatsoever.

*Fifth*, the statute asserts jurisdiction where the offense "occurs in or affects interstate or foreign commerce." 18 U.S.C. § 2339B(d)(1)(E). For the reasons stated in the preceding section with respect to the narco-terror statute, the material support offense charged here did not occur in or affect interstate or foreign commerce.

*Sixth*, the statute provides explicit jurisdiction when the defendant aids and abets another person over whom jurisdiction is valid. 18 U.S.C. § 2339A(d)(1)(F). There is no allegation that would provide jurisdiction over any of Mr. Abdelrahman's co-defendants in this case that is not otherwise applicable to him. As a result, the government here cannot rely on this aiding-and-abetting or conspiracy jurisdiction.

### D.  The Defendant's Presence in the United States Does not Provide Jurisdiction Under These Circumstances

There is no subject matter jurisdiction to prosecute this case in the U.S. courts for two inter-related reasons. First, international law does not permit the United States to prosecute under these circumstances and, as

discussed above, the statute should be read consistently with international law. Second, the language providing jurisdiction where the offender is "brought into or found" in the United States does not apply here, because, in order to be read consistently with international law and give full meaning to the statute, it requires that the defendant be brought to the United States through some sort of lawful procedure. As discussed below, the rendition here was unlawful and therefore that basis for jurisdiction does not apply. Because Mr. Abdelrahman hereby challenges the subject matter jurisdiction of the Court, the burden is on the government to prove the Court has jurisdiction. *See, e.g.*, *U.S. v. Paredes*, 950 F.2d 584, 585 (S.D.N.Y. 1996).[7]

## 1. International Law Does not Permit Jurisdiction Based Solely on the Defendant's Presence in the United States

Customary international law – which, as discussed above, does not control U.S. criminal law but informs judicial interpretations of it – clearly bars application of the narco-terrorism and material support statutes under these circumstances. International law only permits States to exercise

---

[7] We respectfully submit that the government should be required to prove by presenting live evidence at this time any facts upon which it relies to establish subject matter jurisdiction. In particular, if the government intends to argue that the rendition was lawful, it should be required to present evidence to support that contention. Of course, jurisdictional facts must also be proven to the jury beyond a reasonable doubt in the event the case is not dismissed at this juncture.

criminal jurisdiction for acts committed outside the prosecuting State when

one of five relatively narrow bases for jurisdiction is present. *See U.S. v.*

*Yousef*, 327 F.3d 56, 91 f.n. 24 (2d Cir. 2003). The Second Circuit

described these five bases as follows:

> (1) the "objective territorial principle," which provides for jurisdiction over conduct committed outside a State's borders that has, or is intended to have, a substantial effect within its territory;
>
> (2) the "nationality principle," which provides for jurisdiction over extraterritorial acts committed by a State's own citizen;
>
> (3) the "protective principle," which provides for jurisdiction over acts committed outside the State that harm the State's interests;
>
> (4) the "passive personality principle," which provides for jurisdiction over acts that harm a State's citizens abroad; and
>
> (5) the "universality principle," which provides for jurisdiction over extraterritorial acts by a citizen or non-citizen that are so heinous as to be universally condemned by all civilized nations.

*Id*. at 91 f.n. 24.

Some of these bases overlap with the jurisdictional circumstances set

forth in the narco-terror and material support statutes, 21 U.S.C. §

960a(b)(1)-(5) and 18 U.S.C. § 2339B(d)(1). The overlap can be

summarized and examined by reference to the following chart:

| International Law (*Yousef* at 91) | Narco-Terrorism [21 U.S.C. § 960a(b)(1)-(5)] | Material Support [18 U.S.C. § 2339B(d)(1)(A)-(F)] |
|---|---|---|
| Objective Territorial Principle = conduct committed outside a State's borders that has, or is intended to have, a substantial effect within its territory | (1) the prohibited drug activity or terrorist offense is in violation of the criminal laws of the United States; | (D) the offense occurs in whole or in part within the U.S. |
| | (2) the offense, the prohibited drug activity, or the terrorist offense occurs in or affects interstate or foreign commerce | (E) the offense occurs in or affects interstate or foreign commerce |
| Nationality Principle = extraterritorial acts committed by a State's own citizen | (4) the offense or prohibited drug activity occurs in whole or in part outside of the United States, and a perpetrator of the offense or the prohibited drug activity is a national of the United States or a legal entity organized under U.S. law | (A) an offender is a national of the United States or (B) a stateless person whose habitual residence is in the U.S. |
| Protective Principle = acts committed outside the State that harm the State's interests | (3) an offender provides anything of pecuniary value for a terrorist offense that causes or is designed to cause death or serious bodily injury to a national of the U.S. while that national is outside the U.S., or substantial damage to the property of a legal entity organized under U.S. law | |
| Passive Personality principle = acts that harm a State's citizens abroad | | |
| Universality Principle = extraterritorial acts by a citizen or non-citizen that are so heinous as to be universally condemned by all civilized nations | | |
| | (5) after the conduct required for the offense occurs an offender is "brought into or found in" the U.S., even if the conduct required for the offense occurs outside the U.S. | (C) after the conduct required for the offense occurs an offender is "brought into or found in" the U.S., even if the conduct required for the offense occurs outside the U.S. |
| | | (F) an offender aids or abets or conspires with any person over whom jurisdiction exists |

As this table makes clear, there is a basis in international law for jurisdiction under some of the circumstances set forth in the U.S. statutes,

but there is no basis for the "brought into or found in" jurisdiction in both provisions.

As a result, none of the international law bases for extraterritorial jurisdiction applies in this case. The "objective territorial principle" and the "passive personality principle" do not apply because there is no allegation of any conduct that either had or was intended to have any effect on the United States or its citizens. The "nationality principle" of course does not apply because Mr. Abdelrahman is a Malian, not U.S., national. The "universality principle" does not apply because, as the Second Circuit has explicitly found, there is no "universality principle" jurisdiction even over *completed* crimes of terrorism since civilized states continue to disagree over what actually constitutes terrorism. *See Id.* at 107 (district court erred in finding act of placing bombs on civilian planes provided a basis for universal jurisdiction as "terrorism – unlike piracy, war crimes and crimes against humanity – does not provide a basis for universal jurisdiction"); *see also*, *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 178 f.n. 34 (2d Cir. Sept. 17, 2010).

That leaves the protective principle. In applying the protective principle in *Yousef*, the Second Circuit explained that:

> The protective (or security) principle permits a State to assume jurisdiction over non-nationals for acts done to abroad that

> affect the security of the State.  The protective principle
> generally is invoked to obtain jurisdiction over politically
> motivated acts but is not limited to acts with a political purpose.

*U.S. v. Yousef*, 327 F.3d at 110.  In that case, the Second Circuit held

that the protective principle provided jurisdiction only after carefully

analyzing the facts and determining that the defendant's stated purpose – as

supported by evidence adduced at trial – was to influence United States

foreign policy by destroying aircraft.  *Id*.  This could not be further from that

facts in this case where, at worst, the defendants intended to extract some

money from a government agent they believed was an operative for a South

American organization.  In any event, since the crime was instigated,

financed and plotted entirely by an agent working at the behest of the

American government, it cannot possibly be said to have affected or even

potentially affected U.S. security.  Any such interpretation expands the

bounds of the protective principle beyond recognition and must be rejected.

Put another way, any government attempt to lump a Songhai tribesman who

sat through some meetings he could not possibly understand with a masterful

international terrorist who successfully blew up a New York landmark and a

Philippine airplane is *itself* the only conceivable threat to national security in

this case.

In short, there is no jurisdictional basis in international law to prosecute Idriss Abdelrahman. As a result, any ambiguity in the statutes should be interpreted to deny the government jurisdiction here in order to comply with international law.

>    **2.    The "Brought into or Found in" Jurisdictional Provisions Do Not Confer Jurisdiction when a Defendant is Unlawfully Brought into the United States by Government Agents**

As the above analysis makes perfectly clear, international law provides no jurisdictional basis for prosecution in these circumstances: the mere presence of the defendants in the United States does not confer international law jurisdiction under any of the theories set forth above. In other words, the prosecution of Idriss Abdelrahman violates the law of nations. Therefore, the statute should not be construed to confer jurisdiction here "if any other possible construction remains." *McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 21 (1963).

In this particular case, there is a construction of the statutes that would avoid the clash with international law, *viz.* the statutes should be read to confer "brought into or found in" jurisdiction *only* where the defendant is brought here legally (or found here by the authorities without their participation). An illegal rendition should not *create* jurisdiction that did not otherwise exist unless one of the other jurisdictional circumstances is present

because jurisdiction under those circumstances violates international law. Furthermore, any more expansive reading of the "brought into or found in" clauses vitiates the meaning of the other carefully reticulated jurisdictional clauses.

The fact that Mr. Abdelrahman was illegally rendered to the United States spares the Court from even addressing the constitutional questions of whether the extraterritorial application of the statutes is within the scope of congressional power or offends the Due Process Clause of the Fifth Amendment, *see* §§ II-III, *infra*, because, read consistently with international law, neither of the statutes provides jurisdiction where a defendant is unlawfully brought to the United States. The language in both statutes "brought into or found in," *see* 21 U.S.C. § 960a(b)(5) & 18 U.S.C. § 2339B(d)(1)(c) – can only mean the defendant was lawfully transported to the United States or otherwise arrived here on his own volition. It cannot mean, consistently with international law, that he was kidnapped, with or without the connivance of Ghanaian authorities and a federal court warrant. Such an interpretation would violate international law and is not mandated by either provision.

Moreover, permitting jurisdiction in *any circumstance* in which a defendant is physically before the court would render the nine other

jurisdictional provisions in the two statutes unnecessary and obsolete.  It is a familiar canon of statutory construction that every word and clause in a particular statute should be given effect whenever possible.  *See*, *e.g.,* *Chickasaw Nation v. U.S.*, 534 U.S. 84, 93 (2001) (discussing canon and its limits); *U.S. v. Ratzlaf*, 510 U.S. 135, 140-41 (1994) (judges should hesitate to treat words in statutes as surplusage "and resistance should be heightened when the words describe an element of a criminal offense").  If the government's view of the jurisdictional requirements of the statute prevails, however, there is no need *at all* for the other jurisdictional provisions: a U.S. court would have jurisdiction over conduct overseas under *any* *circumstances* so long as the government managed to kidnap the defendant and bring him to the United States.  If that were the rule, there would be no need for the carefully specified circumstances that define jurisdiction such as when the defendant is a U.S. national or when U.S. interests are attacked.

> **3.** **There is No Subject Matter Jurisdiction Here Because Mr. Abdelrahman's Rendition Did Not Comply with Ghanaian Law or U.S. Treaty Obligations**

Mr. Abdelrahman's affidavit sets forth the bewildering circumstances of his rendition to the United States.  Ghana and the United States have had an extradition treaty in force since 1935.  *See* 18 U.S.C. § 3181 (listing extradition treaties in force and identifying the Ghana treaty at 47 Stat.

2122). The treaty provides for extradition for "[c]rimes or offences or attempted crimes or offences in connection with the traffic in dangerous drugs." 47 Stat. 2122 Art. III, § 24. While there are particular conspiracy provisions (such as "conspiracy to murder), *id.* Art. III, § 1), there is no general conspiracy listed and the none that would cover the charged offenses. Moreover, the treaty sets forth various lawful procedures, further defined by domestic laws of the contracting parties. *See, e.g.*, *id*. § 8. There is no evidence that any of the procedures were followed, that Mr. Abdelrahman was provided a Ghanaian attorney or even an interpreter, that Mr. Abdelrahman was presented to a judge, or that Mr. Abdelrahman was given any opportunity to dispute his identity or any other issue typical to extradition proceedings. Rather, after a night in jail under atrocious conditions, he was simply shackled, driven to a chartered plane, and taken to the United States. It appears that he was taken out of the country before his consulate was notified. The DEA did not so much as get his passport stamped.

Moreover, the arrest was unlawful because the warrant purporting to authorize it was invalid on its face as it failed to set forth any basis for extraterritorial jurisdiction. Even if there were jurisdiction based on Mr. Abdelrahman's presence in the United States – and we do not concede there

is – such jurisdiction did not exist *prior* to the arrests and rendition. Therefore, no valid warrant could issue unless another independent basis for jurisdiction existed.

Finally, the arrest was unlawful because no notification was made by any authorities to the Malian consulate in Ghana and, when Mr. Abdelrahman requested that an individual he believed worked with his government be notified, that request was apparently ignored.

It is therefore clear that Mr. Abdelrahman's rendition was in violation of Ghanaian law, in violation of U.S. treaty obligations, and beyond the jurisdiction of the U.S. authorities. His presence here, therefore, cannot create a ground for jurisdiction under either the narco-terrorism statute, 21 U.S.C. § 960a(b)(5), or the material support statute, 18 U.S.C. § 2339B(d)(1)(c). There is no other ground for jurisdiction. This reading of the statutes is the only one that is consistent with international law and the history, language and structure of the provisions. Therefore, there is no subject matter jurisdiction to proceed and the Indictment should be dismissed.

## II. The Indictment Must be Dismissed Because Its Application Here Exceeds Congress' Legislative Authority

As described above, under the unusual circumstances of this case the government will likely be reduced to arguing that subject matter jurisdiction

is based on the fact that Mr. Abdelrahman was brought into the United States after the alleged conduct occurred.  However, we submit that Congress does not have authority to criminalize conduct under these circumstances as there is no allegation that would invoke any congressional power: no factual allegation that there was an intended effect on interstate or foreign commerce and no valid legal ground for exercising Congress' power to prosecute offenses against the law of nations.

In order to protect "fundamental liberties," the Constitution creates a government with enumerated, limited powers.  *See U.S. v. Lopez*, 514 U.S. 549, 552 (1995) (quoting the Federalist Papers that powers delegated to the federal government are "few and defined").  In passing the narco-terrorism statute, Congress explained its view of extra-territorial jurisdiction conferred by the Constitution that justified the 2005 USA PATRIOT Act:

> The Constitution provides the power to enact criminal laws with extraterritorial application.  It vests Congress with, among other things, the power "to regulate commerce with foreign nations *** to define and punish piracies and felonies committed on the high seas, and offenses against the law of nations ***" and gives Congress legislative jurisdiction over places acquired "for the erection of forts, magazines, arsenals, dock- years [sic], and other needful buildings."

H.R. Rep. 109-174(I) at 41.  In applying the narco-terrorism provision to the sovereign territory of foreign countries, Congress therefore apparently

relied on its power to regulate commerce with foreign nations and to punish offenses against the law of nations.

In the material support statute, Congress was more explicit. It enacted an accompanying "finding" that "the Constitution confers upon Congress the power to punish crimes against the law of nations and to carry out the treaty obligations of the United States, and therefore Congress may by law impose penalties relating to the provision of material support to foreign organizations engaged in terrorist activity[.]" Pub. L. 104-132 § 301(a)(2).

The question, then, is whether the power to (1) regulate commerce with foreign nations, (2) punish offenses against the law of nations, or (3) carry out treaty obligations provides Congress to enact a statute asserting extraterritorial jurisdiction in these circumstances. We address each of these proffered bases of congressional power in turn.

### A. The Commerce Clause Does Not Confer Jurisdiction in this Case Because the Government Does Not and Cannot Allege Any Conceivable Effect on Interstate or Foreign Commerce

In *U.S. v. Lopez*, 514 U.S. 549 (1995), the Supreme Court invalidated the Gun-Free School Zones Act which made if a federal crime to possess a firearm in a school, but neither "regulate[d] a commercial activity nor contain[ed] a requirement that the possession be connected in any way to interstate commerce." *Id*. at 551. The statute at issue did not contain an

"express jurisdictional element which might limit its reach to a discrete set of firearm possessions that additionally have an explicit connection with or effect on interstate commerce." *Id*. at 562. Such a statute, the court held, "exceeds the authority of Congress" under Article I, § 8, Cl. 3 of the United States Constitution, which otherwise grants Congress power to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." *See id*.

In this case, as in *Lopez*, the narco-terrorism and material support statutes – applied to a wholly foreign conspiracy – cannot be said to regulate U.S. commerce or be part of a regulatory scheme. *See id*. at 559-561. They cannot, therefore "be sustained under [Supreme Court] cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce." *Id*. at 561.

In addition, both statutes similarly lack "explicit jurisdictional element[s]" that require either the drug trafficking or the material support to have a connection to or effect on interstate or foreign commerce. *See id*. at 561-62. That is not to say, of course, that the statutes do not mention foreign commerce: they both contain statements asserting jurisdiction over offenses that occur in or affect interstate or foreign commerce. But because they

have myriad alternative jurisdictional assertions, this falls short of an "element" that the government must prove at trial.[8]  For example, if the government relies on the "brought into or found in" ground for jurisdiction, it could argue that it has no burden to prove any effect on interstate or foreign commerce.  Thus, like the provision struck down in *Lopez*, the narco-terrorism and material support statutes contain "no jurisdictional element which would ensure, through case-by-case inquiry, that the [offense] in question affects interstate commerce."  *Id.* at 561.

Finally, if these statutes were allowed to apply in Africa based on a transaction that originated in South America and was destined for Europe, they would apply in all places and all times without any limitation whatsoever.  The United States Drug Enforcement Agency would be converted to a world police force, investigating and prosecuting drug crimes that have nothing to do with the taxpayers funding the investigations.  That's what happened here and it should not be permitted to proceed: to expand the Commerce Clause power this far would require American courts "to

---

[8] Note that in the event the Indictment is not dismissed, we reserve the right to insist that the jury be charged that an affect on interstate or foreign commerce is indeed a required element that the government must prove beyond a reasonable doubt because, *inter alia*, such a charge would be required if the statutes have any hope of surviving this Constitutional challenge.

conclude that the Constitution's enumeration of powers does not presuppose something not enumerated, *cf. Gibbons v. Ogden* [9 Wheat 1, 195, 6 L.Ed. 23 (1824) (Marshall, C.J)(defining the nature of Congress' commerce power], and that there will never be a distinction between what is truly national and what is truly" foreign. *U.S. v. Lopez*, 514 U.S. at 567. This the Court should not permit.

**B.    The Authority to Punish Violations of the Law of Nations Does Not Apply Because Narco-Terrorism and Material Support Are Not Violations of the Law of Nations**

Although we readily concede that the Constitution grants Congress the power to define and punish offenses against the law of nations, U.S. Const. Art. I, § 8, cl. 10, that power cannot be invoked here because it is beyond dispute the conduct defined by 21 U.S.C. § 960a and 18 U.S.C. § 2339B does not violate the law of nations. The Second Circuit explained in *Yousef* that offenses against the law of nations constitute a "strictly limited set of crimes subject to universal jurisdiction [that] cannot be expanded by drawing an analogy between some new crime . . .and universal jurisdiction's traditional subjects." *See U.S. v. Yousef*, 327 F.3d 56, 103-04 (2d Cir. 2003). These crimes included piracy and, after World War II, crimes against humanity or war crimes. *Id*. at 105-06. The Second Circuit ruled that offenses against the law of nations *do not* include even completed acts of

terrorism. *Id*. at 106. "Terrorism –," the court wrote, "unlike piracy, war crimes, and crimes against humanity – does not privide a basis for universal jurisdiction." *Id*. at 108.

**C.  No Treaty Obligation Requires Congress to Punish Narco-Terrorism or Material Support**

Our review of the legislative history of both 21 U.S.C. § 960a and 18 U.S.C. § 2339B reveals no particular treaty obligation fulfilled by the statutes. Indeed, these statutes go far beyond what most countries would punish in their domestic law. To the extent the government relies on any particular U.S. treaty obligation to justify Congress' power to reach the conduct alleged here, we will address that in reply.

**III.  The Indictment Must be Dismissed Because Application to These Facts Would Violate Mr. Abdelrahman's Due Process Rights under the United States Constitution**

The argument in Section One, *supra*, goes to the proper interpretation of the extent and reach of the jurisdictional provisions of the statutes. The argument in Section Two goes to Congress' power to enact statutes that reach the conduct alleged here. This section focuses on the *particular defendant's* rights under the Due Process Clause of the Fifth Amendment as

they have developed in case law considering the application of American law to foreign conduct.[9]

**A. Governing Legal Standard: The Government Must Allege a Sufficient Nexus to the United States so that the Application of U.S. Law is Not Arbitrary or Unfair**

The Second Circuit, adopting language from the Ninth Circuit, has set forth a test to govern when the extraterritorial application of U.S. criminal law might violate the Due Process Clause: "in order to apply extra-territorially a federal criminal statute to a defendant consistently with due process, there must be a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair." *U.S. v. Yousef*, 327 F.3d 56, 111 (2d Cir. 2003), *quoting U.S. v. Davis*, 905 F.2d 245, 248-49 (9th Cir.1990); *accord, e.g., U.S. v. Yousef*, S3 08 Cr. 1213 (JFK), 2010 WL 3377499 at *3 (S.D.N.Y. Aug. 23, 2010) (no dispute that nexus test applies in a narco-terrorism prosecution).

---

[9] I understand that counsel for co-defendants Oumar Issa and Harouna Toure intend to make this same due process argument on behalf of their clients. Mr. Abdelrahman adopts and joins the arguments of co-defendants on this point to the extent they are consistent with the argument set forth herein. We do not, however, adopt any concession or assumption in those briefs that may suggest in any way that jurisdiction is valid under U.S. or international law.

Applying this standard in *Yousef*, the Second Circuit concluded that extraterritorial jurisdiction did not violate the Due Process Clause because "[t]he defendants conspired to attack a dozen United States-flag aircraft in an effort to inflict injury on this country and its people and influence American foreign policy." *U.S. v. Yousef*, 327 F.3d at 112. On a different count charging the defendants with bombing a Philippine Airlines flight from Manila to Japan, the court found jurisdiction was consistent with due process because that attack was a "test-run" in furtherance of the conspiracy to attack American planes. "Given the substantial intended effect of their attack on the United States and its citizens, it cannot seriously be argued that the defendants' conduct was so unrelated to American interests as to render their prosecution in the United States arbitrary or fundamentally unfair." *Id*.

The Ninth Circuit has elaborated on the nexus test, explaining that it serves the same purpose as the "minimum contacts" test in civil jurisdiction. *U.S. v. Klimavicius-Viloria*, 144 F.3d 1249, 1257 (9ᵗʰ Cir. 1998). The nexus test:

> ensures that a United States court will assert jurisdiction only over a defendant who "should reasonably anticipate being haled into court" in this country. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). Just as the question of personal jurisdiction should be decided by the court prior to trial, so should the question of nexus, even though it is part of the jurisdictional requirement.

*Id.  See also*, *U.S. v. Al Kassar*, 582 F.Supp.2d 488, 494 (S.D.N.Y. 2008).  The Ninth Circuit thus upheld a number of prosecutions of foreign defendants found on foreign-flag vessels on the high seas, where there was proof that they were carrying illegal drugs destined for United States territory.  *See, e.g.*, *U.S. v. Davis*, 905 F.2d at 249; *U.S. v. Klimavicius-Viloria*, 144 F.3d at 1257-59; *U.S. v. Khan*, 35 F.3d 426 429-30 (9th Cir. 1994).

In light of this caselaw, we respectfully submit that the burden is on the government, prior to trial, to demonstrate that there was sufficient connection between Idriss Abdelrahman and the United States so that (1) the application of the narco-terrorism and material support statutes would not be arbitrary or fundamentally unfair and (2) Mr. Abdelrahman could or should have reasonably anticipated being haled before this Court if he committed the conduct alleged.  As discussed in the next section, this the government cannot do.

### B.      Application: There was No Nexus and So the Indictment Must be Dismissed

Even if Mr. Abdelrahman did everything the government ascribes to him – and the proof at trial will prove with singular clarity that he did not – it is inconceivable that he could have anticipated being shunted onto a chartered DEA jet and brought to the Southern District of New York.

Nothing that he is alleged to have done has anything to do with the United States in any way – except that it was instigated by DEA agents at U.S. taxpayer expense.

The alleged plot involved smuggling drugs for a Colombian organization from South America to Africa to Spain. Not a word of English was spoken at any meeting. All the meetings took place in Ghana. None of the participants had ever even been to the United States. The instrumentalities of the plot were European and African – a Mercedes truck, a Malian passport, payment in Euros that were seized. Not a single word was spoken about attacking American targets or bringing drugs to the U.S. market. If Mr. Abdelrahman were guilty of everything the government alleges, at most he should have reasonably anticipated being brought to court in Ghana, Mali or perhaps even Spain or Colombia. There is no way that he could ever have guessed that behind CS-1 and CS-2's mask of deception lay the United States Drug Enforcement Administration and a chartered jet waiting to whisk him off to New York City. Application of U.S. law in these circumstances is arbitrary and fundamentally unfair.

**IV.** **Mr. Abdelrahman's Statement on the Plane Should Be Suppressed because it was Obtained in Violation of the United States Constitution**

Mr. Abdelrahman moves to suppress the statement he allegedly made to law enforcement while en route from Ghana to New York on December 16, 2009. Suppression is warranted pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). Mr. Abdelrahman describes in detail in his Affidavit how he was questioned while in shackles on a chartered DEA jet after his arrest. *See* Ex. D: Abdelrahman Aff. ¶ 16-25. He states that he did not receive any of the required *Miranda* warnings, at least in any language he could understand. *Id*. ¶ 24. Therefore, assuming the Government contends that valid *Miranda* warnings were indeed administered, a hearing is required. *See U.S. v. Mathurin*, 148 F.3d 68, 69-70 (2d Cir. 1998) (an assertion that Miranda warnings were not given before custodial questioning is sufficient to require a suppression hearing).

**V.** **The Court Should Compel the Government to Assist the Defense in Bringing Material Witnesses Muhammad Touré and Yacouba Abdelrahman to Testify at Trial or in Depositions**

Finally, in the event the case is not dismissed at this stage, Mr. Abdelrahman moves the Court to issue subpoenas to secure the attendance as witnesses at trial of Mohammed Touré and Yacouba Abdelrahman, to pay their travel expenses pursuant to Rule 17(b) of the Federal Rules of Criminal

Procedure, and to compel the government to assist them in obtaining visas and any other necessary travel documents.

### A. The Need for the Witnesses' Testimony is Set Forth *Ex Parte* Pursuant to Rule 17(b)

In an accompanying *Ex Parte* Affirmation, the defense asserts under oath the basis for Mr. Abdelrahman's belief that both these proposed witnesses will provide testimony that is material, favorable and indeed critical to the defense. The Affirmation is being submitted *ex parte* pursuant to Rule 17(b), which states in relevant part: "Upon a defendant's *ex parte* application, the court must order that a subpoena be issued for a named witness if the defendant shows an inability to pay the witness's fees and the necessity of the witness's presence for an adequate defense." While the present papers put the government on notice of the defendant's motion to procure the presence of these two witnesses for their trial testimony, the defendant explains why the witnesses are necessary for an adequate defense in the *ex parte* mode contemplated by Rule 17(b) in order to ensure that "defendants will not have to make a premature disclosure of their case." *U.S. v. Greschner*, 802 F.2d 373, 380 (10th Cir. 1986). *See also U.S. v. Scott*, 223 F.3d 208, 211 (3d Cir. 2000); *U.S. v. Meriwether*, 486 F.2d 498, 506 (5th Cir. 1973) (the *ex parte* provision of [Rule 17] . . . was intended to

shield the theory of [the defendant's] defense from the prosecutor's scrutiny."), *cert. denied*, 417 U.S. 948 (1974).

The Court should facilitate the witnesses' testimony because they can provide crucial evidence that relates to both defendant's character and the substance of the case. *See U.S. v. Largan*, 330 F.Supp. 296, 299 (S.D.N.Y. 1971) (citing *Edgington v. U.S.*, 164 U.S. 361 (1896)) (granting motion to authorize defendant to bring two foreign character witnesses to testify at trial at government expense because "'good character, when considered in connection with the other evidence in the case, may generate a reasonable doubt. . . . Proof of this kind may sometimes be the only mode by which an innocent man can repel the presumption arising from the prosecution's case."). Details supporting this contention are contained uniquely in the *Ex Parte* Affirmation.

> **B.** **The Court has Authority to Issue Subpoenas and Order the Payment of Travel Expense of a Non-Resident Alien Living Abroad**

The Court has the power to issue a subpoena and order payment of travel expenses for a witness who is a non-citizen living abroad if the witness is willing to come to the United States and voluntarily submit to the Court's jurisdiction. *See U.S. v. Largan*, 330 F.Supp. at 299. In telephone conversations with the defendant's investigator, both witnesses expressed

their willingness to travel from Mali to the United States in order to give their testimony before the Court. *See Ex Parte Affirmation* ¶ 6.

The witnesses can be served with subpoenas by traveling to the United States[10] and accepting service here. Once within the United States, the proposed witnesses can be subpoenaed. *See In re Grand Jury Proceedings U.S. v. Field*, 532 F.2d 404, 410 (5th Cir. 1976), *cert. denied*, 429 U.S. 940 (1976) (a federal court has the power to subpoena a non-resident alien present in the United States); *U.S. v. Germann*, 370 F.3d 1019, 1022-23 (2d Cir. 1967), *vacated on other grounds*, 389 U.S. 329 (1967) ("[A]nyone within the jurisdiction of the court may be subpoenaed . . . . It makes no difference where he is a resident or of what country he is a citizen."); *cf. U.S. v. Largan*, 330 F.Supp. at 298-299 (the court "authorizes the defendant to bring [from the Philippines] to New York at the time of

---

[10] Mr. Touré's ability to travel may be complicated by the fact that, until recently, he was incarcerated in Accra, Ghana as a result of conduct associated with the offense conduct in this case, although he is not a defendant in this case and has not, to our best knowledge, faced charges in the United States. He has since returned to Mali, but it is unclear whether the Ghanaian government has imposed travel restrictions upon him. If this is the case, then we request that the Court direct the government to make efforts to obtain the Ghanaian government's cooperation with the United States to authorize Mr. Touré to travel to the United States at the time of trial.

trial, at government expense, two [non-citizen] witnesses who are willing to testify in person as to his character.").

In addition to the case law, the Advisory Committee Note to the 1944 adoption of Federal Rule of Criminal Procedure 17(b) shows that it should apply to foreign witnesses who will voluntarily submit to the Court's jurisdiction:

> This rule preserves the existing right of an indigent defendant to secure attendance of witnesses at the expense of the government . . . . The rule provides that an indigent defendant will be able to secure the attendance of witnesses at the expense of the government no matter where they are located.

Moreover, since the foreign witnesses agree to submit voluntarily to the Court's jurisdiction, the Court has the power to issue the subpoenas and order payment of travel expenses pursuant not only to Rule 17(b), but also based on two constitutional provisions: the defendant's Sixth Amendment right to compulsory process for obtaining witnesses in his favor, and the defendant's Fifth Amendment due process guarantee against discrimination because of indigence. *See U.S. v. Barker*, 553 F.2d 1013, 1020 (6th Cir. 1977); *U.S. v. Sims*, 637 F.2d 625, 629 (9th Cir. 1980); *U.S. v. Bennett*, 539 F.2d 45 (10th Cir. 1976); *U.S. v. Moore*, 917 F.2d 215, 230 (6th Cir. 1990); *U.S. v. Florack*, 838 F.Supp. 77, 79 (W.D.N.Y. 1993). If the relief sought is denied, Mr. Abdelrahman would be deprived of one or more witnesses

critical to his defense, and he would be deprived of those witnesses simply because of his impoverished status. *See U.S. v. Largan*, 330 F. Supp. at 299 (S.D.N.Y. 1971) (requiring that the government "ensure that [the defendant's] poverty will not deprive him of an effective defense.").

Finally, for the reasons stated above, it is essential that the government fully cooperate with the defense in order to facilitate the process for obtaining the documents necessary for Mr. Touré and Mr. Abdelrahman to travel to the United States at a reasonable time before the beginning of the trial. *See U.S. v. Huang*, 827 F.Supp.945, 947 (S.D.N.Y. 1993) (granting the defendant's motion for an order preventing the government "from deporting the material witnesses or taking any other action that would materially interfere with defendant's Sixth Amendment right to obtain the testimony of the four material witnesses at trial."). In particular, we request that the Court direct the assistant United States attorneys assigned to this case to coordinate with the State Department to ensure that visas are available for the witnesses. In the event that Mr. Touré requires permission from the Ghanaian authorities to travel to the United States, we request the government and the United States Attorney's Office aid in obtaining the Ghanaian officials' cooperation in authorizing Mr. Touré to travel to the United States so he can give his testimony before this Court. We are aware

that during Mr. Touré's detention by the Ghanaian authorities, the

government was in contact with the Ghanaian authorities and arranged an

interview with Mr. Touré on March 10, 2010 while he was under Ghanaian

authority.  *See* Ex. C (Letter from prosecutors describing interview of Mr.

Touré).  The government is thus currently in contact with the appropriate

Ghanaian authorities as concerns this case and should be in the position to

help obtain their cooperation.

### C.     In the Alternative, the Defendant Requests an Order for a Deposition

Should the Court deny the Rule 17(b) motion for subpoenas, costs and

documents and authorizations necessary to travel to the United States, the

defendant, in order to preserve his rights at trial, moves in the alternative for

the Court to order the taking of depositions pursuant to Federal Rule of

Criminal Procedure 15.

The Court may order the deposition of a prospective witness "to

preserve testimony for trial" in "exceptional circumstances and in the

interest of justice."  Fed. R. Crim. P. 15(a)(1).  Such exceptional

circumstances exist where (i) the prospective witness is unavailable for trial;

(ii) the witness' testimony is material; and (iii) the testimony is necessary to

prevent a failure of justice.  *U.S. v. Cohen*, 250 F.3d 68, 78 (2d Cir. 2001).

The second and third factors are closely related, "the principal consideration

guiding whether the absence of a particular witness' testimony would produce injustice is the materiality of that testimony to that case*." U.S. v. Drogoul*, 1 F.3d 1547, 1552 (11th Cir. 1993). *See also U.S. v. Sanchez-Lima*, 161 F.3d 545 (9th Cir. 1998). For the reasons stated in the *ex parte* affirmation, Mr. Touré's and Mr. Y. Adbelrahman's testimony is material and necessary to prevent a failure of justice.

If the Court were to deny the motion for a subpoena pursuant to Rule 17(b), Mr. Touré and Mr. Y. Abdelrahman would be unavailable for trial and the defendant would have been unable to procure their attendance by process or other reasonable means. *See* Fed. R. Evid. 804(a)(5) (a witness is unavailable if he is "absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance . . . by process or other reasonable means."). The deposition testimony of each witness would thus be admissible at trial pursuant to Federal Rule of Criminal Procedure 15(f) and Federal Rule of Evidence 804(b)(1).

The witnesses could also be unavailable for trial if they could not travel to the United States at the time of trial for practical or personal reasons. Notably, the proposed witnesses will not be available for trial if they cannot obtain the visas necessary to enter the United States. Mr. Touré may not be able to enter the United States if he requires permission from the

Ghanaian government and it is not granted.  Also, although Mr. Abdelrahman has agreed to travel to the United States, he may not be able to leave his home country at the time of trial due to the fact that his family's survival, as well as the defendant's family, depends on his ability to provide for them.  Both proposed witnesses could be prevented from coming to the United States because of the difficulties and dangers of traveling through the Malian territory.  In this respect, according to the Court's decision in *U.S. v. Sindona*, 636 F.2d 792, 804 (2d Cir. 1980), though affidavits are preferred, "[i]t is proper for the court to accept, in its discretion, the [oral] representations o[f] counsel with respect to the unavailability of a witness." Also, the Eleventh Circuit has noted that the showing of unavailability "need not be conclusive before the depositions can be taken."  *U.S. v. Dragoul*, 1 F.3d 1547, 1552 (11th Cir. 1993).

Finally, the Government's payment of expenses is required pursuant to Federal Rule of Criminal Procedure 15(f) since, as an indigent represented by counsel under the Criminal Justice Act, the defendant is unable to bear the expenses of taking the depositions.

We note that arranging for depositions in Mali will pose high – perhaps insurmountable – hurdles.  Mali is not a signatory of the Hague Convention for Taking Evidence Abroad.  *See* List of Signatories to

Convention on the Taking of Evidence Abroad, *available at*

http://www.hcch.net/upload/overview20e.pdf.  Setting up a deposition in

Mali may require letters rogatory from the U.S. State Department to the

government of Mali asking for permission to take depositions in Mali.  This

process may take months or longer, and the request may be denied or

ignored.

      The live testimony at trial of the proposed witnesses is the fairest way

to present the jury the evidence at trial.  So long as the government

cooperates, the arrangements needed to procure the live testimony could be

accomplished relatively quickly and avoid the delays in taking the legal

steps necessary for depositions of witnesses in Mali and the cost of sending

all counsel to Mali.  The government's payment of the proposed witnesses'

expenses for travel to the United States is likely the most cost-effective

method of procuring this crucial evidence.

## <u>CONCLUSION</u>

For the reasons set forth above, the requested relief should be granted.

Dated:      New York, New York
             December 17, 2010

Respectfully submitted,

Law Office of Zachary Margulis-Ohnuma

By: *Zachary Margulis-Ohnuma*
Zachary Margulis-Ohnuma (ZM-4932)
260 Madison Avenue, 18th Fl.
New York, NY 10016
(212) 685-0999