UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

- AGAINST -

HAROUNA TOURE, IDRISS
ABDELRAHMAN,

DEFENDANT.

---

09 Cr. 1244 (BSJ)

**MEMORANDUM AND EXHIBITS IN
OPPOSITION TO GOVERNMENT'S
SENTENCING MEMORANDUM**

Law Office of Zachary Margulis-Ohnuma
260 Madison Avenue, 18th Fl.
New York, NY
(212) 685-0999
zach@zmolaw.com

*Attorney for Defendant* Idriss Abdelrahman

Michael Hurwitz
Miriam Hurwitz
Hurwitz Stampur and Roth
299 Broadway, Suite 800
New York, NY 10007
(212) 619-4240

*Attorneys for Defendant* Harouna Toure

This Memorandum and accompanying exhibits are submitted on behalf of defendants Idriss Abdelrahman and Harouna Toure in response to the Sentencing Memorandum of the United States (hereinafter "Mem.") filed on October 16, 2012.  In particular, this Memorandum addresses the government's arguments that the Sentencing Guidelines enhancement for terrorism, USSG § 3A1.4, applies in this case.  As such, it supplements our original letter to the Court dated July 5, 2012 arguing that the enhancement does not apply.

## QUESTION PRESENTED

The government and the defense appear to agree that the central issue in dispute is whether, pursuant to USSG § 3A1.4, the government has shown by "a preponderance of the evidence that [Harouna Toure and Idriss Abdelrahman] had the specific intent to commit an offense that was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."  Mem. at 15.  The government relies solely on the " 'involved' prong identified in [*U.S. v.*] *Awan* [, 607 F.3d 306 (2d Cir. 2010)]" and correctly notes that the crime of conviction, 18 U.S.C. § 2339B, is an enumerated statute under 18 U.S.C. §

2332b(g)(5).  Mem. at 15-16.[1]  In order to meet its burden, the government

argues that "the crime of material support to the FARC, as charged here,

constituted an offense calculated to influence or affect or to retaliate against

the conduct of a government."  Mem. at 15-16.  The government rests its

argument on its contentions that, as a factual matter, the evidence shows

that:

> (1) "the defendants understood that the Colombian
> organization with which they were dealing
> intended to use the money from the drug shipment
> to engage in violent retaliatory attacks against the
> American government[,]"  Mem. at 16; and

> (2) "it was made clear to both defendants that
> assisting with the drug shipment would aid the
> FARC's cause—including its efforts to retaliate
> against the United States."  Mem. at 21.

As discussed below, these assertions are not legally sufficient to

support the application of the terrorism enhancement and, moreover, are

unsupported by the record.  In short, even if the government could prove the

defendants "knew" and "understood" that Mohamed and David were

---

[1] In the event the Court permits the government to alter its argument to proceed on the "intended to promote" prong of the enhancement, we respectfully request an opportunity to address that prong in writing as well. However, the government's brief argues only that "Toure's and Abdelrahman's agreement to help the FARC transport cocaine satisfies the 'involved' prong identified in *Awan*."  Mem. at 15.  The government presents no argument that the "intended to promote" prong also applies and so we do not address that question.

interested in violently attacking the United States (which it cannot), it is unable to point to anything in the record showing that the defendants acted with the requisite *intent*, i.e. that Idriss and Harouna planned their conduct to achieve the object of retaliating against the United States government, which is required for the enhancement to apply.

## GOVERNING LEGAL STANDARDS

The government has not disputed that, as a matter of law, it is required to show that the each of the defendants *himself* "sought to influence or affect the conduct of a government" or to retaliate against government conduct. *U.S. v. Stewart*, 590 F.3d 93, 138-39 (2d Cir. 2009) (affirming district court's decision not to apply terrorism enhancement to the translator convicted of material support of terrorism, where record did not show that the translator "himself sought to influence or affect the conduct of a government."), *citing U.S. v. Leahy*, 169 F.3d 433, 446 (7th Cir. 1999). Since the government is proceeding pursuant to the "involved" prong, under *Stewart* the enhancement is only "applicable to [the defendant] if he himself had committed a federal crime of terrorism." *U.S. v. Stewart*, 590 F.3d at 138 (citing cases). In turn, "commission of a federal crime of terrorism, which would trigger the 'involved' prong of the enhancement, incorporates a specific intent requirement, namely that the underlying felony was

3

calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." *Id*. (internal quotations omitted).  In *Stewart*, the Second Circuit upheld the denial of the enhancement to a translator who worked with Lynne Stewart on the ground that the government did not offer evidence that the translator "himself sought to influence or affect the conduct of government."  *Id.*  It was not enough that he was aware that his confederates were trying to influence government by coercion since that was not the *defendant's* conscious purpose.

The court in *Awan*, which the government relies on, similarly made clear that under the "involved" prong, it must be the *defendant* whose conduct was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."  *U.S. v. Awan*, 607 F.3d  at 317.  In so doing, the panel carefully defined "calculation," distinguishing it from motive:

> "Motive" is concerned with the rationale for an actor's particular conduct.  *See, e.g., U.S. v. Aguilar*, 585 F.3d 652, 656, 660 (2d Cir. 2009) (discussing motive as underlying purpose); Wayne R. LaFave, *Substantive Criminal Law*, § 5.3 (2d ed. 2009) (discussing definitions of motive). "Calculation" is concerned with the object that the actor seeks to achieve through planning or contrivance.  *See Webster's Third New International Dictionary Unabridged* 315 (1986)

(defining "calculated" in pertinent part, as "planned or contrived so as to accomplish a purpose or achieve an effect; thought out in advance").  Calculation may often serve motive, but they are not, in fact, identical.  Section 2332b(g)(5)(A) does not focus on the defendant but on his "offense," asking whether it was calculated, *i.e.,* planned–for whatever reason or motive–to achieve the stated object. Thus, as we noted in *Stewart*, [590 F.3d 93 (2d Cir. 2009)] the section is better understood as imposing a requirement "that the underlying felony [be] calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." *Stewart,* 590 F.3d at 138 (emphasis added).

*U.S. v. Awan*, 607 F.3d at 317.  Thus, we respectfully submit, it is not enough under the "involved" prong for a defendant to have knowledge that his co-conspirators are engaged in conduct intended to affect government;[2] rather the defendant himself must intend to affect government. *See* Model Penal Code §§ 1.13(12) 2.02(a) (defining "purposely," a synonym for "intentionally," as when a person acts with a "conscious object to engage in conduct…to cause [a] result").

Accordingly, under *Awan*, the operative question in this case is whether Mr. Abdelrahman and Mr. Toure's assistance to David and

---

[2] Of course, since David and Mohamed were working as confidential sources, there is no dispute that they did not *actually* commit an offense calculated to affect the conduct of government through intimidation or coercion, or retaliate against government conduct.

5

Mohamed was calculated to influence or affect the conduct of a government by intimidation or coercion, or to retaliate against government conduct. "Calculated," in turn, means that the conduct must have been planned or contrived to "accomplish a purpose or achieve an effect' thought out in advance." *U.S. v. Awan*, 607 F.3d at 317.  Under the government's theory, this purpose must have been to "use the money from the drug shipment to engage in violent retaliatory attacks against the American government." Mem. at 16.  The question, then, is: Was that Idriss and Harouna's specific intent in agreeing (with each other) to assist in the drug trafficking?

## ARGUMENT

### I.     The Government Has Failed to Allege that the Defendants Acted with the Conscious Purpose Required for Application of the Terrorism Enhancement

We respectfully submit that this is not a close case, because the government *has not even alleged* that Idriss and Harouna *themselves* intended to bring about violent retaliatory action against the United States.

The government marshals evidence of the defendants' knowledge of David and Mohamed's supposed background, but they present nothing that bears on the defendants' intent or purpose.  Even if the defendants knew specifically that David planned to "engage in violent retaliatory attacks against the American government" with the proceeds of the drug

transaction—which we do not concede—that would not be enough to show that their own conduct was "planned, for whatever reason or motive, to achieve the stated object," *Awan*, 607 F.3d at 317, of retaliating against the United States. At most, the government alleges that the defendants *knew* that such action would ultimately result from the drug transportation.  But knowledge alone does not prove intent and so the terrorism enhancement does not apply.[3]  *See U.S. v. Stewart,* 590 F.3d 93, 138 (2d Cir. 2009) (rejecting government argument that defendant's intent could be imputed from his knowledge of co-conspirators' activities).

## II.    The Government's Evidence Does not Support Its Conclusion that the Defendants Believed that their Drug Smuggling Would Assist in "Violent Retaliation Against the U.S. Government"

Moreover, the government vastly overstates its factual case even with respect to knowledge.  Each of the passages pointed to by the government,

---

[3] It is worth noting that in this respect, the terrorism enhancement is distinct from the crime of conviction, 18 U.S.C. § 2339B.  Conviction under § 2339B requires only knowledge of the organization's terrorist activities, not intent to further such activities. *See Holder v. Humanitarian Law Project*, 130 S.Ct. 2705, 2717-18 (2010) ("Congress plainly spoke to the necessary mental state for a violation of § 2339B, and it chose knowledge about the organization's connection to terrorism, not specific intent to further the organization's terrorist activities.").  The lack of a specific intent requirement in § 2339B also distinguishes it from the surrounding material support statutes, which require specific intent, and conviction of which is therefore more likely to give rise to application of the enhancement (since the *mens rea* requirements of those statutes more closely resemble the intent requirement in the enhancement).  *Id.* at 2718.

read in context, is ambiguous and confusing.  The one fact regarding Idriss

and Harouna's intentions that remains clear throughout the recordings is that

"it's money that talks." 12/13/09 Tr. at 56.  Indeed, as David urged

Mohamed in Spanish (a language no one but Mohamed can understand) to

explain that the "cause" is the important thing, not the money, Mohamed

defies him, telling Idriss and Harouna just the opposite.  Abdelrahman

Sentencing Memo Ex. V: 11/18/09 Tr. at 20.  This took place the moment

before David took out the $25,000 to give to the defendants:

> David (Spanish): The money…the money's not
> important right now.  What's important is the
> cause we're fighting for.  That's why we have to
> be united.
>
> Mohamed (French): [Sigh] He says we must be
> united.  It's the relationship, it's… it's…
>
> David (Spanish): No… the money's not important.
> Did you tell him the money's not important?
>
> Mohamed (French): He says that the money isn't
> important….  But for him, it's the money that's
> important to him, you understand?

*Id*. (emphasis added).  As usual, Idriss responds, "thank god."  *Id*. at

21.

The government relies on ambiguous, inconsistent statements like

these to conclude that Idriss and Harouna believed that "the Colombian

organization with which they were dealing intended to use the money from

the drug shipment to engage in violent retaliatory attacks against the

American government." Mem. at 16. But never once does Mohamed

mention the American government (as opposed to "the Americans" more

generally). Never once does Mohamed indicate what the Colombians will

do with the drugs once they get to Europe, how much profit they will make

or specifically who will get those profits, other than David himself. Most

significantly, Mohamed and David never make any link between the drug

trafficking and their anti-American, anti-capitalist feelings. Rather, as

Mohamed tells Idriss and Harouna, "it's the money that is important to him."

Abdelrahman Sentencing Memo Ex. V: 11/18/09 Tr. at 20.

     **Kidnapping.** The only anti-American action that the government

even arguably can point to was the reference to kidnapping at the October 6,

2009 meeting, where Idriss was not even present. But the government does

not fairly describe the meeting when it claims that, "Hamada asked Toure if

he knew people who could help kidnap Americans. Toure responded that he

knew people in Mali who could do that, and that recently three Belgian

citizens had been kidnapped in Mali and were returned for a large ransom."

Mem. at 17.[4] In fact, the passage the government is referring to reads as

---

[4] The government cites the PSR here and at other points in its memo. That is
patently improper since we objected to the PSR and the PSR relies on
information the government provided. We therefore address only citations
to evidence in the record.

follows in the undisputed translation (// indicate voices overlapping; original

language is French except as noted):

> Mohamed: You paying [sic], maybe... paying charity for the jihad... the mujahedin?
>
> Toure: Yes. We give. There's even... //
>
> Hamada (in Arabic to Mohamed): // I will show you his passport. He went on pilgrimage four, five times, huh. //
>
> Toure: // ...a lot, a lot, a lot of Arab Malians, there be [sic] lot of money. [sic] Always giving [sic] barrels diesel oil, 10, 20, I take it there, give, there's no problem. Here... Mali... uh... Turareg, that's not good.
>
> Hamada: If I, example [sic], I... uh... *kidnapping* [n.b. "Kidnapping" in English] Americans, people, example. [sic]
>
> Toure [Laughs.]: Yeah.
>
> Hamada: Is there place [sic] over there?
>
> Toure: Allah.
>
> Hamada: There is?
>
> Toure: Even the other day... //
>
> Hamada: Yes.
>
> Mohamed: The Austr... the *Austrians* [n.b. "Austrians" in Spanish], they paid.
>
> Toure: // Even the [U/I] //
>
> Mohamed: // [U/I] //
>
> Toure: This one guy, he took three French, not French, it's Belgium [sic], three, over there, Mali, a billion, and they gave a billion. //
>
> Mohamed: They paid!
>
> Hamada: // Mm. Mm. Mm. A billion! //

10

> Mohamed: There is no god but God.
>
> Toure: They paid two billion.
>
> Mohamed: That's better than what we're doing.
>
> Toure: Two billion.
>
> Hamada: Have you got, have you got somebody there?
>
> Toure: Yes! By God.
>
> Hamada: Possible one time.
>
> Toure: Ah.
>
> Hamada: Possible one time.
>
> Toure: You leave... /
>
> Hamada: go, go with my brother over there [sic].
>
> Toure: By God.

Abdelrahman Sentencing Memo Ex. P: 10/6/09 Tr. at 20.

Nowhere in this passage or elsewhere in the recordings does Harouna claim that "he knew people who could do" kidnappings of Americans. *Contra* Mem. at 17. Moreover, the government does not appear to allege that Hamada represented himself as part of FARC or that Idriss and Harouna's crime involved assisting Hamada. Mohamed's statement that being paid two billion is "better than what we're doing" appears to be an acknowledgement that he smuggles drugs, and does not "do" kidnappings.[5]

---

[5] As we pointed out in our Sentencing Memo, there is no record of any Belgians ever being kidnapped in the Sahara. *See* Idriss Abdelrahman Sentencing Memo at 23, f.n. 10 (*citing* Dkt. No. 106: 3/12/12 Defense Expert Notice Exhibit C). The DEA could not find any evidence of the

Accordingly, even if Harouna believed that Hamada was interested in attacking America by kidnapping our citizens in Africa, there is no evidence that he believed that such kidnappings could be furthered by the drug transactions.

Most significantly, Idriss was not present and there is no evidence that he was aware of this exchange with Hamada

**The Shared Anti-American Cause**.  The government's references to "a shared cause," hating Americans, FARC being a revolutionary group, David being a revolutionary thinker and a military man, and FARC's desire to help Al Qaeda all shed no light on either Idriss or Harouna's alleged intent to "retaliate against America."  First of all, these statements were all made by Mohamed and never adopted or responded to by Idriss and Harouna.  Second, none of Mohamed and David's anti-American sentiments link back to the drug transaction in any way; when the drug transaction is discussed, it is always in the context of how much money can be made from it.  There is no hint that the drug transaction is a way to hurt America or will fund violence against Americans.  *Cf. U.S. v. Mohammed*, 693 F.3d 192, 195

---

kidnapping mentioned as of an October 20, 2009 email to the prosecutors. *See* Ex. A: GX 3501-14.  Nonetheless, Agent Stouch assured AUSA Guruanjan Sahni in the email that "[d]uring the meeting Harouna seemed to indicate it was a pretty low key incident."  *Id.*  This assertion mischaracterizes what was said at the meeting.

(D.C. Cir. 2012) (applying terrorism enhancement to defendant who, upon hearing that drugs would be sent to America, "declared 'Good, may God turn all the infidels to dead-corpses.'").

**Retaliation**.  The government also mischaracterizes the evidence that Idriss and Harouna were aware that David was interested in retaliating against the American government for killing his brother.  Mem. at 19, 20. The government points to page 38 of the November 18, 2009 meeting (which is GX 123-T).  But the government's translation of that page and the preceding pages says nothing about any American killing David's brother – it just says "they killed his brother."  Abdelrahman Sentencing Memo Ex. V: 11/18/09 Tr. at 38.  Mohamed never says that "the Americans" killed David's brother, let alone that the American *government* did so.  Moreover, the response from Harouna and Idriss was one of obvious confusion: Idriss asks "him?" and "our brother?" because he has no idea whom Mohamed is talking about; when Mohamed repeats himself in French and asks if they understand, Harouna asks "him?" because he does not understand.  *Id.*

**Al Qaeda**.  Finally, the government asks the Court to speculate that because Harouna admitted that he knew that David and Mohamed wanted to work with Al Qaeda, he must have known that they intended to use the drug proceeds to fund attacks on America.  But that inference reflects a

fundamental misunderstanding of what the word "Al Qaeda" means in an African context, and meant to Harouna. As Harouna testified at the *Fatico* hearing, he was only vaguely aware of the nature of Al Qaeda and its war with America. Fatico Tr. at 227-30.

Nonetheless, the government faults Harouna for his ignorance while arguing that he was, in fact, knowledgeable about Al Qaeda. Mem at 17, f.n. 3. At his PSR interview, Harouna told the officer that he knew Al Qaeda had attacked the United States, but "he believed that members of Al Qaeda were Americans. He remarked that in Mali, people who conduct similar attacks on the country are from Mali. He stated that he did not understand that Al Qaeda members came from a different country than the United States." Toure PSR ¶ 41; *see also* Fatico Tr. at 227-29 (Toure Cross Examination).

But such an attitude is not uncommon among the Songhai of Gao. The defense expert, Prof. Jeremy Keenan—a University of London anthropologist who has studied the peoples of the Sahara for the past 40 years and who is actively engaged in Saharan affairs as a contractor for the European Union, the United States and other governmental entities—has reviewed Harouna's *Fatico* testimony and provided an opinion to the Court. *See* Ex. B: Keenan Letter. As Dr. Keenan writes:

> Based on my knowledge of media in Mali and
> elsewhere in the Sahara, I find Mr. Toure's
> statements to be consistent with what might be
> understood and said by an illiterate Songhai living
> in Gao who is largely dependent for information
> on Malian TV and radio, which is of poor quality
> and offers limited world news coverage. …
>
> Mr. Toure's seeming lack of knowledge about
> such things as Al Qaeda, the World Trade Center
> attacks and even the concept of "terrorism," is not
> at all surprising.  These sorts of things are rarely
> discussed amongst Gao people.  One would be
> unlikely to hear them being mentioned in normal
> discourse in Gao, simply because they are very
> foreign, unfamiliar, and have no bearing on life in
> Gao, at least prior to the civil war which began last
> year.

Ex. B at 1.[6]

Harouna's ignorance of Al Qaeda is corroborated by the tapes, not

contradicted by them.  The government claims that a phone call on

November 30, 2009 showed that "Toure was familiar with kidnappings

carried out by AQIM members in North Africa."  Mem. at 17, f.n. 3.  But the

call does not support that assertion at all: rather, in the call, Toure refers to a

---

[6] Dr. Keenan had expressed similar opinions even before the *Fatico* hearing
with respect to the knowledge the defendants displayed on the undercover
recordings.  *See* Dkt. No. 132: Abdelrahman Sentencing Mem. Ex. B. at 3-4
("The transcripts reveal that the defendants have little or no knowledge of
either the position and structure of Al Qaeda and/or Al Qaeda in the Islamic
Maghreb (AQIM), or AQIM's role in the cocaine trafficking business,
which, at that time, was peripheral or non-existent.").

concern that Mohamed previously expressed about incidents in Mauritania.

Mem. Ex. E at 2 ("Toure: You said there's a problem in Mauritania or

actually what did you tell me?").  Harouna was referring to a call from a few

minutes earlier that the government failed to translate.  On that call, which

was cut off in the middle, Mohamed – *not Harouna* – asked about

Mauritania: "Well, another thing, eh what happened today there was a

problem in Mauritania this, this, this problem also is not going to affect our

work either? No?".  A defense translation of the call, which we had planned

to offer in evidence (and previously provided to the government), is attached

hereto as Exhibit C.  In the call that the government points to, Harouna

follows up on the earlier call by asking Mohamed "what did you tell me?"

about a problem in Mauritania.  Mohamed goes on to explain that some

Spaniards were "taken."  Harouna has no idea what Mohamed is talking

about, but nonetheless assures Mohamed that the kidnapping won't interfere

with their drug transport.  Mem. Ex. E at 2.  In fact, Harouna's assurances

were false because the hostage situation and the recent crash of a drug plane

had caused the smuggling routes to be shut down at the time of that phone

call.  *See* Abdelrahman Sentencing Memo Ex. B: Keenan Letter at 6

("Further evidence of this almost complete lack of knowledge of the drugs-

cum-terrorist situation in this part of the Sahara-Sahel by both the defendants

and the DEA [sources] is the fact that the region, at the time of this proposed sting operation, was in a state of almost complete lockdown.  At no other time in the region's history (except during the rebellion of the last five months) was it more difficult to enter, let alone cross, the desert areas north of Gao, than at the time of the sting operation in 2009.").[7]

### III.   The Terrorism Enhancement Was Not Intended to Apply Where, as Here, the Defendants Did Not Intend to Influence or Affect the Conduct of Government by Intimidation or Coercion, or to Retaliate Against Government Conduct

The terrorism enhancement imposes dire consequences on those who do not just knowingly provide material support to a terrorist organization, but do so intending that the material support be used to influence or affect government conduct through coercion or intimidation or to retaliate against government conduct.  USSG § 3A1.4.  In this case, imposition of the enhancement would increase the Guidelines sentence almost four-fold, from 46 months to 180 months.[8]  This jump reflects, as the government points out,

---

[7] Dr. Keenan specifically cited the kidnapping of the Spanish citizens (along with a high profile French hostage) by AQIM as one of the reasons for the lockdown.  Abdelrahman Sentencing Memo Ex. B: Keenan Letter at 6.

[8] The government incorrectly states that the "resulting Guidelines range is 292 to 365 months' imprisonment."  Mem. at 1.  In fact, if the enhancement is imposed, the Guidelines sentence is "the statutorily authorized maximum sentence" under to USSG § 5G1.1(a); *see also* Abdelrahman PSR ¶ 82.  In this case, that would be fifteen years, which would be the "starting point and

the "dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal" in cases where the enhancement applies.  Mem. at 14, *quoting U.S. v. Meskini,* 319 F.3d 88, 92 (2d Cir. 2003).

But these considerations are not in play in this case.  Far from being a dangerous crime, this episode was a colossal waste of government money on incompetent targets who merely went along with the government agents so long as they were throwing money at them.  Both Mr. Abdelrahman and Mr. Toure are easy to deter and rehabilitate because, unlike those to whom the enhancement applies, they are not driven by any ideology at all, other than the desire to improve their economic circumstances.  If one thing is clear from the tapes, it is that money influences every decision made by Idriss and Harouna.  They have now learned that crime does not pay and have been forcefully deterred from engaging in future criminal conduct.[9]

As we pointed out in our initial submission addressing the terrorism enhancement, application of the terrorism enhancement is typically reserved for crimes that involve or promote specific acts of violence calculated to affect or retaliate against governments. *See, e.g.*, *U.S. v. Chandia*, 675 F.3d

initial benchmark" for any non-Guidelines sentence.  *U.S. v. Gall*, 552 U.S. 38, 49 (2007).

[9] Mr. Abdelrahman, in particular, has expressed to counsel that although he does not understand the terrorism charges very well, he believes that God is punishing him for getting involved in drug trafficking.

329 (4th Cir. 2012) (defendant planned to participate in jihad training and fight in Pakistan and provided high-tech equipment including paintball guns for military training to a Pakistani terror group); *U.S. v. Cromitie*, No. 09 Cr. 558 (CM), 2011 WL 2693293 (S.D.N.Y. Jun. 29, 2011) (defendants agreed with undercover to bomb two New York City synagogues and fire missiles at U.S. military aircraft); *U.S. v. Haouari*, 429 F.Supp.2d 671 (S.D.N.Y. 2006) ("Millennium Plot" to bomb Los Angeles International Airport); *U.S. v. Mandhai*, 375 F.3d 1243 (11th Cir. 2004) (conspiracy to destroy electrical power stations in Florida to coerce release of Muslim prisoners).  The government has pointed to no case where mere knowledge that a group was engaged in terrorism was enough to trigger the enhancement or where the evidence of the defendants' knowledge (let alone intent) was so attenuated from any actual plot as it is in this case.  Rather, the defendants here are akin to the translator Yousry in the *Stewart* case: they are not "people who support[] or believe[] in the use of violence to achieve what [they] want."  Ex. D: Yousry Sentencing Minutes at 143 (quoting government closing). As such, the terrorism enhancement does not apply to them and the correct Guidelines sentence is 46 - 57 months.

## CONCLUSION

For the reasons set forth above, the terrorism enhancement under

USSG  § 3A1.4 does not apply to Harouna Toure or Idriss Abdelrahman.

Dated:      New York, New York
            October 23, 2012


Respectfully submitted,

Law Office of Zachary Margulis-Ohnuma

By: _____
Zachary Margulis-Ohnuma (ZM-____)
260 Madison Avenue, 17th Fl.
New York, NY 10016
(212) 685-0999


CC:   AUSA Christian Everdell, Esq. (via ECF and email)
      AUSA Edward Kim, Esq. (via ECF and email)
      Michael Hurwitz, Esq. (via ECF and email)